**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Michael David BLUM,
Defendant-Appellant.**

**No. 79–5171.**

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 28, 1979.

Decided Jan. 30, 1980.

Ralph P. Ginocchio, Cincinnati, Ohio, for defendant-appellant.

James C. Cissell, U. S. Atty., John M. DiPuccio, Cincinnati, Ohio, for plaintiff-appellee.

Before LIVELY and ENGEL, Circuit Judges, and PECK, Senior Circuit Judge.

LIVELY, Circuit Judge.

The issue in this case is whether the district court properly denied the defendant's motion to suppress his statements and admissions to the police following an "investigative stop." The district court also denied defendant's motion to suppress tangible evidence, consisting of nine truck tires and wheels, which had been stolen from a railroad car. The defendant led the police to the stolen tires following his first interrogation. After suppression was denied, the defendant waived his right to trial by jury and there was a trial to the court. Defendant was found guilty of stealing the nine tires and wheels from an interstate shipment, 18 U.S.C. § 659, and this appeal followed. We reverse for the reasons hereinafter set forth.

On December 20, 1978 at approximately 8:00 p. m. Cincinnati police officers Mann and Smith were patrolling in an unmarked car. They noticed a somewhat dilapidated pickup truck bearing a temporary license plate parked on the shoulder, headed north on the east side of Interstate Highway 75 within the city limits. At the same time the officers saw three men running across I–75 from the west to the east side. Railroad tracks were located a short distance west of I–75 in the area where the truck was parked and the men were seen. These tracks consisted of a through track and a siding where trains were frequently parked. The officers testified that there were no trains on the tracks at the time they noticed the truck and the men but that there had been numerous complaints of objects being stolen from trains in this location. The officers pulled off the interstate and waited at the next exit beyond where the truck was parked. Shortly thereafter the truck also came off I–75, but the officers were unable to follow it in the traffic.

The same officers testified that shortly after midnight they again saw the truck parked directly opposite where it had earlier been seen; this time it was headed south, parked on the west shoulder of the highway. A train carrying automobiles was stopped on the nearby railroad track. The officers stopped on the shoulder of the highway three to four hundred yards from the parked truck and requested by radio that other police cars be dispatched to the area. Sometime later the pickup reappeared going south on I–75 and was stopped by one of the recently-dispatched officers in a marked police car. Officer Mann, who had first spotted the pickup earlier in the evening, testified that he assisted the policeman who stopped the truck and that three male occupants were removed from the truck and patted down immediately. Officer DePue, who had stopped the truck, then took the defendant Blum to his police cruiser. Both Mann and DePue testified that it was a very cold night and that there was moving traffic on I–75, a circumstance which led them to put Blum in DePue's cruiser and the other two occupants of the truck in another police car.

Shortly after getting into the car with Blum, Officer DePue told Officer Mann to follow him, stating, "The property is up off I–75." Officer DePue, with the defendant in his cruiser, drove back to the area where the truck had earlier been parked, and Officer Mann followed in the unmarked police car. The defendant then led the two officers to an area between the highway and the railroad tracks and showed them nine automobile tires still mounted on wheels. The defendant said that the tires had been taken from the train. At this point the defendant was advised that he was under arrest. Blum had previously been handcuffed, but the handcuffs were removed in order for him to carry the tires to the highway. He was handcuffed again before being taken to the police station.

Both Mann and DePue testified that they were carrying out "an investigative stop" when the pickup truck was stopped and the occupants were removed. Both witnesses testified that they looked into the open bed and cab of the truck after "frisking" the occupants and that they found no weapons or stolen property at that time. In examining the truck the officers noted that there was no ignition key and that the ignition wires had been crossed.

The defendant Blum was operating the truck when it was stopped and his drivers license was taken. He was told by DePue that he was stopped because the truck had a loud muffler. A radio check was made to learn if there were any outstanding warrants for Blum and it was determined that there were none. The police did not check the temporary license on the truck at that time. It was after the "pat down" and search of the truck and inquiry about outstanding warrants had produced nothing that Blum was placed in the police cruiser. The defendant was not handcuffed at that time. Both officers testified that they had no evidence that a crime was being committed or about to be committed at the time the truck was stopped and Blum was placed in the cruiser, but that they had strong suspicions that "something was going on" which required investigation. This was based on their experience and knowledge of thefts from railroad cars in the area and their observation of the truck and the three men crossing the highway.

It is undisputed that the defendant was not advised of his right to remain silent prior to making a statement to Officer DePue in the police cruiser. The officer testified that after getting into the car with the defendant he advised Blum that the area was staked out and that the police knew the defendant was taking "stuff" down there and "right now we wanted to know where the property was." DePue testified that at that time Blum told him, "The stuff is back there." Officer DePue testified that the defendant was free to go after the search and radio inquiry had produced no evidence of criminal activity, but that he was not free to go after he made the statement, "The stuff is back there."

After the tires were located the other occupants of the truck were placed under

arrest and all three were taken to a police station. The truck was driven to the station by one of the officers. At the station Officer Mann read a statement of rights to Blum, and Blum signed a card acknowledging the fact that he had been advised of his rights and that he waived the right to have an attorney present. Interrogation followed and the culmination was that Blum gave a full statement of his activities and those of his companions with respect to the tires which were stolen from railroad cars on the evening of December 20–21.

The key to decision in this case lies in the meaning of the term "in custody." In *Miranda v. Arizona,* 384 U.S. 436, 467–68, 86 S.Ct. 1602, 1624, 16 L.Ed.2d 694 (1966), the Supreme Court held—

> At the outset, if a person in custody is to be subjected to interrogation, he must first be informed in clear and unequivocal terms that he has the right to remain silent.

This warning was termed "an absolute prerequisite in overcoming the inherent pressures of the interrogation atmosphere." *Id.* at 468, 86 S.Ct. at 1624. After setting forth the other constitutional rights which must be detailed before interrogation begins, the Court dealt with the consequences of failure to give the required advice:

> The warnings required and the waiver necessary in accordance with our opinion today are, in the absence of a fully effective equivalent, prerequisites to the admissibility of any statement made by a defendant. No distinction can be drawn between statements which are direct confessions and statements which amount to "admissions" of part or all of an offense. The privilege against self-incrimination protects the individual from being compelled to incriminate himself in any manner; it does not distinguish degrees of incrimination. 384 U.S. at 476, 86 S.Ct. at 1629.

The district court held that the initial stop of the pickup was justified. The court found that the officers testified "to specific, articulable facts which, in light of [their] experience, gave rise to a reasonable infer-

ence that criminal activity may have been afoot." The evidence fully supports this finding and we agree that the officers made a proper "*Terry* stop." [*Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)]. The "narrow question" considered in *Terry* was whether there are circumstances where it is reasonable for a policeman to seize a person and search him for weapons when there is no probable cause for an arrest. 392 U.S. at 15, 88 S.Ct. 1868. The circumstances in this case satisfied the requirements for the initial stop and "pat down." When no weapons were found, the arresting officers examined the truck and found no stolen goods. They then checked with headquarters by radio for outstanding warrants and learned of none. This extension of the *Terry* stop appears to be permitted by *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972), where the Court stated:

> A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time. (Citations omitted).

Our problem with the present case begins at the point where the officers, after finding no evidence to support their suspicions of criminal activity, nevertheless continued to restrain the defendant. The district court held that Blum's on-the-scene statements to Officer DePue did not result from custodial interrogation in that no significant deprivation of freedom had occurred. The setting of the initial interrogation—the back seat of a police cruiser—was not determinative, according to the court. Its finding that the interrogation was not custodial rested, the court stated, "on the absence of any indicia of police dominance, compulsion, or incommunicado interrogation during the initial stop." The district court also emphasized the fact that Blum was told he was stopped for having a loud muffler and that he had not been formally arrested or handcuffed when he made the first incriminating statement. We disagree with the hold-

ing that Blum's initial statement did not result from custodial interrogation.

The reference to the loud muffler was a mere pretext. The pickup was stopped because the officers suspected criminal activity. The fact that Blum was not formally arrested is not determinative. *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 2258, 60 L.Ed.2d 824 (1979). We believe the defendant was significantly deprived of his freedom when he was separated from his two companions and placed in one of the police cruisers with a uniformed officer. Though more than "a coercive atmosphere" is required to trigger the need for *Miranda* warnings, *Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977), the restriction on Blum's freedom was sufficient to require a finding that he was, in fact, in custody. This custody was not supported by probable cause and constituted an unwarranted extension of the limited detention permitted under *Terry v. Ohio, supra,* and *Adams v. Williams, supra.* This was a violation of the Fourth Amendment.

The Fifth Amendment question in this case is whether Blum could be questioned further, under these circumstances, without being advised of his basic constitutional rights. In *Miranda* the Court described the point at which the warnings must be given in the following language:

> The principles announced today deal with the protection which must be given to the privilege against self-incrimination when the individual is first subjected to police interrogation while in custody at the station or otherwise deprived of his freedom of action in any significant way. It is at this point that our adversary system of criminal proceedings commences, distinguishing itself at the outset from the inquisitorial system recognized in some countries. Under the system of warnings we delineate today or under any other system which may be devised and found effective, the safeguards to be erected about the privilege must come into play at this point.

384 U.S. at 477, 86 S.Ct. at 1629.

The questioning of Blum was quite pointed and accusatory—Officer DePue told him they knew he was taking "stuff" and wanted to know right then where it was. The "adversary system of criminal proceedings" had begun and the defendant was entitled to the safeguards described in *Miranda.*

The district court relied upon a partial quotation from the *Miranda* opinion:

> Our decision is not intended to hamper the traditional function of police officers in investigating crime. . . . General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding . . . . In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present.

384 U.S. at 477–78, 86 S.Ct. at 1630. The language from the opinion which is omitted, as shown by the first break in the above quotation, is significant:

> When an individual is in custody on probable cause, the police may, of course, seek out *evidence in the field* to be used at trial against him. Such investigation may include inquiry of persons *not under restraint.*
>
> *Id.* (emphasis added).

It is clear from the entire passage that the "general on-the-scene questioning" referred to by the Court is questioning of other possible witnesses, not the person being detained.

The statement by Blum given in the police cruiser must be suppressed. Since recovery of the stolen tires and wheels and the subsequent confession flowed from the on-the-scene statement, this evidence must also be suppressed. The fact that full *Miranda* warnings were given before the defendant gave his station house statement does not make that statement admissible. Though the statement may have satisfied the Fifth Amendment requirement of voluntariness, this is only the threshold requirement where there has been an illegal detention. *Brown v. Illinois,* 422 U.S. 590, 603–04, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).

A Fourth Amendment violation occurred when the police detained Blum beyond the period required to "frisk" him for weapons and "to maintain the status quo momentarily while obtaining more information . . . ." *Adams v. Williams, supra,* 407 U.S. at 146, 92 S.Ct. at 1922. The prosecution had the burden of proving that the taint of the illegal detention and questioning had been attenuated. *Brown v. Illinois, supra,* 422 U.S. at 604, 95 S.Ct. 2254. The record convinces us that the station house confession was obtained by "exploitation of the illegality of his" detention. *Dunaway v. New York, supra,* 442 U.S. at 217, 99 S.Ct. at 2259. As in *Dunaway,* there were no intervening events which "broke the connection between [defendant's] illegal detention and his confession." *Id.* at 219, 99 S.Ct. at 2260.

The judgment of the district court is reversed and the case is remanded for entry of an order granting defendant's motion to suppress and for further proceedings consistent with this opinion.