**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Howard HILL, Defendant-Appellant.**

**No. 79–5264.**

United States Court of Appeals, Fifth Circuit.

Sept. 24, 1980.

Jeffrey S. Weiner (argued), Alan S. Ross, Jeffrey S. Weiner, Weiner, Robbins, Tunkey & Ross, P. A., Miami, Fla. (on the brief), for defendant-appellant.

William S. Sutton, Asst. U. S. Atty., Janis M. Caplan, Sp. Asst. U. S. Atty., Atlanta, Ga., for plaintiff-appellee.

Before TUTTLE, GOLDBERG and RANDALL, Circuit Judges.

RANDALL, Circuit Judge:

Appellant Howard Hill was convicted in a non-jury trial for possession of phencyclidine (PCP) with intent to distribute, in vio-

---

**15.** In view of our holding, we need not reach the issues raised in connection with plaintiffs' § 12(2) claims.

lation of 21 U.S.C. § 841(a)(1). Prior to trial, Hill moved to suppress the PCP on the basis that it had been seized from him in violation of his fourth amendment rights by DEA Agent Paul Markonni at the Atlanta Hartsfield International Airport on January 9, 1979. After a hearing on the motion to suppress, the magistrate recommended denial of the motion. The district court adopted the magistrate's report with minor modifications and denied the motion to suppress. Hill then waived jury trial and was tried and found guilty on stipulated facts. The issue on appeal is whether the district court erred in denying the motion to suppress.

*Facts and Proceedings Below*

The story of Howard Hill's conviction begins with an anonymous telephone tip received at approximately 8:22 p. m. on January 6, 1979 by a telecommunicator for the Greensboro, North Carolina police department. The unknown caller stated that a half-million dollars drug deal was "going down" at the Greensboro Airport, and described one of the persons involved in the deal as being a black man wearing a green coat with white fur trim. The information was relayed to Detective Baulding of the Greensboro Narcotics Division. He called the Greensboro Airport and relayed the tip to a sheriff's deputy, requesting the deputy to check the airport for anyone fitting that description.

About five minutes later, Baulding was advised that a person fitting that description had been observed in the lobby of the airport talking with another black man. Baulding was told that the man who fit the description was about 6′1″ and 175 pounds, with black hair, a mustache and a short-cropped full beard. This person was observed leaving the airport on an Eastern Airlines flight to Atlanta. The other black man, who was described as being in his twenties, 5′6″ to 5′8″, clean shaven, with a medium complexion and an Afro, and wearing light pants and a dark jacket, was observed leaving the airport in a car with North Carolina license plates.

A license check indicated that the car was registered to a Howard Hill in Greensboro. Knowing that Howard Hill had twice been charged with drug violations and, based on his personal knowledge of Hill, Baulding suspected that the man in the green coat flying to Atlanta was Hill.

Baulding called an Atlanta airport police sergeant, relayed the information and told him that the suspect was en route to Atlanta on a flight bound for Los Angeles. The sergeant relayed this information to Agent Markonni of the DEA. No one was available to intercept the flight, so Markonni called Eastern Airlines and spoke with a supervisor. Markonni asked that a gate agent meet the flight to verify the suspect's presence on board and to ascertain his destination. Soon thereafter Markonni was told by the gate agent that a person matching the suspect's description had deplaned, asked for directions to Eastern's next outbound flight to Los Angeles, and was directed to the departure gate for a non-stop flight from Atlanta to Los Angeles. Markonni later learned from Eastern Airlines personnel that the suspect was traveling under the name of Williams. Markonni was unable to contact the Los Angeles airport police.

For the next two days, Markonni looked for a man matching the suspect's description and checked passenger lists of incoming flights from Los Angeles for a passenger by the name of Williams. At about 5:30 a. m. on January 9, Markonni noticed a passenger wearing a green coat with white fur trim and matching the suspect's description disembark from a Los Angeles-Atlanta flight. While the passenger was obtaining flight information from a Delta Airlines gate agent, Markonni learned from his airline ticket that a passenger who was traveling under the name of "Mike Williams" had checked one piece of luggage, and was on a continuing flight to the Raleigh-Durham area. The airline computer showed that Williams bought his ticket at the Los Angeles airport thirty-one minutes prior to the scheduled departure.

Markonni approached the man (who was later identified as Howard Hill) in the gate waiting area. He sat down next to Hill, identified himself, and asked Hill if they could talk for a few minutes. Hill agreed. Hill told Markonni that he was Mike Williams but that he had no identification other than his airline ticket, which he showed to Markonni. The ticket bore the name of Mike Williams.

Markonni told Hill that he was looking for narcotics coming through the airport and said, "I'm going to ask you for your cooperation in allowing yourself to be very quickly searched for drugs or narcotics." Hill immediately responded, "Not without a search warrant." Markonni again requested Hill's consent to a search and Hill again refused. Markonni then pointed to the Delta office directly across the rotunda of the airport, and said "Well, I'm going to ask you if you'll come with me over to that office where there is a telephone." Without saying anything, Hill got up and began to walk with Markonni towards the office. Markonni never told Hill that he could not leave or that he was under arrest, nor did he advise Hill that he was free to leave if he desired. On the way to the Delta office, Hill placed his hand inside his coat pocket, and Markonni asked him to remove it. Hill immediately began running down the concourse. He was subdued by three Delta agents, and Markonni handcuffed him, took him to the Delta office and searched him. A green pouch containing the PCP was found strapped to Hill's waist. Hill was formally placed under arrest.

The magistrate treated the initial contact between Markonni and Hill as a *Terry*[1] stop requiring a reasonable suspicion of criminal activity. First, on the basis of the anonymous tip and the facts known to Markonni at the time of the initial contact, which matched elements of the "drug courier profile"[2]—(1) that the suspect arrived from Los Angeles, a major drug distribution center; (2) that the reservation for the flight was made approximately 30 minutes before the scheduled departure time, and the ticket was purchased at the Los Angeles ticket desk; (3) that the suspect was thought to have traveled to Los Angeles two days earlier, signifying a trip of short duration; (4) that the suspect's flights were scheduled at off-peak hours; and (5) that the suspect had a continuing flight to Raleigh-Durham, indicating a trip of unusual itinerary, since he was suspected of leaving from the Greensboro Airport—the magistrate concluded that a reasonable suspicion of criminal activity existed at the moment of the initial contact. Second, relying on *United States v. Oates*, 560 F.2d 45 (2d Cir. 1977), the magistrate characterized the request for Hill to accompany Markonni to the Delta office as a valid "continuation of the investigation." Finally, the magistrate concluded that Hill's suspicious behavior in putting his hand in his coat pocket and fleeing from the scene gave Markonni probable cause to search Hill. Therefore, the magistrate recommended that the motion to suppress be denied.

The district court adopted the magistrate's findings and recommendation. However, in response to Hill's objections to the magistrate's fact findings, the district court clarified a portion of the magistrate's opinion.[3] With respect to the magistrate's statement that Markonni and Hill "proceeded to walk across the rotunda lobby," Hill argued that the record did not indicate that he agreed to or actually did walk with

---

1. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

2. The "drug courier profile" is "an informally compiled abstract of characteristics thought typical of persons carrying illicit drugs." *United States v. Mendenhall*, —— U.S. ——, 100 S.Ct. 1870, 1873, 64 L.Ed.2d 497 (1980). For a listing of the characteristics on the profile, *see United States v. Ballard*, 573 F.2d 913, 914 (5th Cir. 1978).

3. The district court also modified one of the fact findings of the magistrate. It found that the magistrate had incorrectly described Hill as a "suspected drug dealer" rather than a "known violator of drug laws." In the district court's view, this modification of the facts did not require a different outcome on the reasonable suspicion issue.

Markonni. In response to this objection, the district court stated that "[a] review of the record indicates that [Hill] and Agent Markonni did begin to walk across the lobby together. There is no testimony indicating that [Hill] had consented to go with Agent Markonni, and the magistrate does not indicate that there was." Record on Appeal, Vol. 1, at 107. Thus, the district court specifically found that Hill did not voluntarily consent to accompany Markonni to the Delta office.

### Issues On Appeal

On appeal, Hill argues that the district court erred in denying the motion to suppress because (1) no reasonable suspicion existed at the time Markonni approached Hill and began questioning him;[4] (2) Markonni's request for Hill to accompany him to the Delta office constituted an arrest requiring probable cause, which did not exist at the time of the request; and (3) no probable cause existed at the time of the search. The Government disputes Hill's contentions and, in addition, argues that the magistrate and district court erroneously concluded that the initial encounter was a *Terry* stop requiring reasonable suspicion. Citing *United States v. Elmore*, 595 F.2d 1036 (5th Cir. 1979), the Government contends that the initial encounter between Markonni and Hill was merely a "police-citizen contact" falling outside the scope of the fourth amendment.

Thus, we are faced with five issues in this case: (1) whether the initial encounter between Markonni and Hill constituted a "seizure" within the meaning of the fourth amendment; (2) if the initial encounter was a "seizure", whether a reasonable suspicion existed at the time of the seizure; (3) whether an arrest requiring probable cause occurred when Markonni requested Hill to accompany him to the Delta office; (4) whether probable cause existed for the subsequent search; and (5) whether, if Hill's

fourth amendment rights were violated at any point, the PCP was the tainted product of that illegality.

On October 1, 1979, the Supreme Court granted the petition for certiorari in *United States v. Mendenhall*, 444 U.S. 822, 100 S.Ct. 42, 62 L.Ed.2d 29 (1979), a "drug courier profile" case involving issues similar to those presented by the case before us. After hearing oral argument in this case in New Orleans, Louisiana on October 18, 1979, we decided to delay disposition of this appeal pending the Court's action in *Mendenhall*. The Court's decision in *Mendenhall* was announced on May 27, 1980. —— U.S. ——, 100 S.Ct. 1870, 64 L.Ed.2d 497. As we will explain below, we have determined that *Mendenhall* is distinguishable from this case and that the judgment of conviction must be reversed on the basis of the Supreme Court's analysis in *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979).

The threshold issue in this case is whether Hill's fourth amendment rights were violated when agent Markonni approached Hill on the airport concourse and began asking him questions. There are two steps in the analysis: (1) whether the initial contact was a "seizure" within the meaning of the fourth amendment; and (2) if a "seizure" occurred, whether a reasonable suspicion of criminal activity existed at the time of the seizure. Beyond the threshold issue, however, is the question whether, under the circumstances, the arrest in this case occurred at the time Markonni requested Hill to accompany him to the Delta office or at the time Hill was subdued by the Delta gate agents and was searched. If the arrest occurred at the time Markonni requested Hill to accompany him to the Delta office, Hill's fourth amendment rights were violated, since the Government has never contended that probable cause existed at the time of the request.[5] If, on the other hand, the arrest occurred after Hill fled and

---

4. Hill contends that the anonymous tip cannot be used to support a finding of reasonable suspicion, and that the other facts known to Markonni at the time of the initial contact were

insufficient to justify a finding of reasonable suspicion.

5. The Government has always argued that only a reasonable suspicion of criminal activity ex-

was subdued, the issue of probable cause would be a much closer one. Because we have determined for the reasons set out below that, even if the initial encounter between Markonni and Hill was lawful, Markonni's request for Hill to accompany him to the Delta office constituted an arrest requiring probable cause and, thus, the district court erred in denying the motion to suppress, we need not and do not decide the threshold question whether the initial encounter violated Hill's fourth amendment rights.[6]

### Arrest

In *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), the

---

isted until Hill fled from Markonni, and that Hill's flight was the factor which elevated Markonni's reasonable suspicion to the level of probable cause.

**6.** The Government, citing *United States v. Elmore*, 595 F.2d 1036 (5th Cir. 1979), argues that the initial encounter between Markonni and Hill did not constitute a "seizure" within the meaning of the fourth amendment. Alternatively, it argues that a reasonable suspicion that criminal activity was afoot existed at the time of the initial contact. The "seizure" issue was not raised by the Government below because *Elmore* was not decided until after the magistrate and the district court had made their findings.

In *United States v. Mendenhall*, —— U.S. ——, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), a majority of the Supreme Court held that heroin seized from Mendenhall by DEA agents at the Detroit Airport was admissible at trial in that her fourth amendment rights were not violated. The threshold question in that case was whether she had been seized in violation of her fourth amendment rights. Two members of the Supreme Court held that Mendenhall was not "seized" within the meaning of the fourth amendment when the agents approached her on the airport concourse and asked her questions. According to Justices Stewart and Rehnquist, "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." —— U.S. at ——, 100 S.Ct. at 1877. Justices Stewart and Rehnquist concluded that Mendenhall did not have any objective reason to believe that she was not free to go. Justice Powell, joined by Chief Justice Burger and Justice Blackmun, concluded that, even if the stop constituted a "seizure," the stop did not violate the fourth amendment since the agents had a reasonable suspicion that Mendenhall was engaging in criminal activity. They declined to reach the issue whether Mendenhall was "seized" within the meaning of the fourth amendment. Therefore, a majority of the Court, based on two forms of analysis, concluded that the agents' initial contact with Mendenhall did not violate her fourth amendment rights. However, since neither form of analysis commanded a majority of the Court, the views expressed by the majority Justices in the two plurality opinions do not constitute binding precedent.

Prior to the Supreme Court's decision in *Mendenhall*, the Fifth Circuit, in *United States v. Elmore*, 595 F.2d 1036 (5th Cir. 1979), adopted essentially the same definition of a "seizure" as that advocated by Justices Stewart and Rehnquist in *Mendenhall*. *See United States v. Robinson*, 625 F.2d 1211 (5th Cir. 1980). *Elmore* held that, even though a DEA agent approached Elmore, identified himself as a federal narcotics agent, asked to see Elmore's airline ticket and asked him questions, no "seizure" within the meaning of the fourth amendment occurred until Elmore's airplane ticket was removed from his immediate presence. The court held that since the initial encounter was not precipitated by force, there was no physical contact, the only show of authority occurred when the agents initially approached Elmore and identified themselves as law enforcement officers, and the tone of the conversation and events indicated that Elmore was not compelled to continue the encounter, no "seizure" had occurred.

Because we have determined that Hill's fourth amendment rights were violated *after* the initial encounter, we need not determine whether the initial encounter was unlawful. We note, however, that the circumstances surrounding the initial encounter in *Elmore* are very similar to those in this case. In addition, with respect to the question whether a reasonable suspicion existed at the time of the initial contact, we note that this is not a case in which the Government seeks to justify a seizure on the basis of the "drug courier profile" characteristics alone. Rather, in addition to the profile characteristics, the Government relies on an anonymous tip, which it argues was corroborated by the subsequent observations of Markonni. Thus, though we intimate no view with respect to the question whether the anonymous tip in this case could properly provide any support for a finding of reasonable suspicion, we note that this case may be distinguishable from those cases in which the only facts used to justify a seizure involved characteristics matching the "drug courier profile." *See, e. g., Reid v. Georgia*, —— U.S. ——, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curiam); *United States v. Buenaventura-Ariza*, 615 F.2d 29 (2d Cir. 1980); *United States v. McCaleb*, 552 F.2d 717 (6th Cir. 1977).

Supreme Court held that detention for custodial interrogation must be supported by probable cause. Thus, it concluded that Dunaway's fourth amendment rights were violated when, without probable cause, the police took him to the station involuntarily for purposes of interrogation. The Court refused the Government's invitation to adopt a multifactor balancing test of " 'reasonable police conduct under the circumstances' to cover all seizures that do not amount to technical arrests." *Id.* at 213, 99 S.Ct. at 2257. Rather, the Court held that for all but certain narrowly defined intrusions, "the requisite 'balancing' has been performed in centuries of precedent and is embodied in the principle that seizures are 'reasonable' only if supported by probable cause." *Id.* at 214, 99 S.Ct. at 2257.

The Court described the nature of the narrow exception to the probable cause requirement, first recognized in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed. 889 (1968), as follows:

> *Terry* for the first time recognized an exception to the requirement that Fourth Amendment seizures of persons must be based on probable cause. That case involved a brief, on-the-spot stop on the street and a frisk for weapons, a situation that did not fit comfortably within the traditional concept of an "arrest." Nevertheless, the Court held that even this type of "necessarily swift action predicated upon the on-the-spot observations of the officer on the beat" constituted a "serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment," 392 U.S. at 20, 17 [88 S.Ct. at 1879, 1877], and therefore "must be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures." *Id.*, at 20 [88 S.Ct. 1879]. However, since the intrusion involved in a "stop and frisk" was so much less severe than that involved in traditional "arrests," the Court declined to stretch the concept of "arrest"—and the general rule requiring probable cause to make arrests "reasonable" under the Fourth Amendment—to cover such intrusions. Instead,

the Court treated the stop and frisk intrusion as a *sui generis* "rubric of police conduct," 392 U.S., at 20 [88 S.Ct. 1879]. . . . Thus, *Terry* departed from traditional Fourth Amendment analysis in two respects. First, it defined a special category of Fourth Amendment "seizures" so substantially less intrusive than arrests that the general rule requiring probable cause to make Fourth Amendment "seizures" reasonable could be replaced by a balancing test. Second, the application of this balancing test led the Court to approve this narrowly defined less intrusive seizure on grounds less rigorous than probable cause, but only for the purpose of a pat-down for weapons.

> Because *Terry* involved an exception to the general rule requiring probable cause, this Court has been careful to maintain its narrow scope. *Terry* itself involved a limited, on-the-street frisk for weapons. Two subsequent cases which applied *Terry* also involved limited weapons frisks. . . . *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), applied *Terry* in the special context of roving border patrol stopping automobiles to check for illegal immigrants. The investigative stops usually consumed less than a minute and involved " a brief question or two." *Id.*, at 880 [95 S.Ct., at 2579]. . . .

> [The State] now urges the Court to apply a balancing test, rather than the general rule, to custodial interrogations, and to hold that "seizures" such as that in this case may be justified by mere "reasonable suspicion." *Terry* and its progeny clearly do not support such a result. The narrow intrusions involved in those cases were judged by a balancing test rather than by the general principle that Fourth Amendment seizures must be supported by the "long prevailing standards" of probable cause, *Brinegar v. United States* [338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949)], only because these intrusions fell far short of the kind of intrusion associated with an arrest. Indeed, *Brignoni-Ponce* expressly refused

to extend *Terry* in the manner [the State] now urges. The Court there stated: "The officer may question the driver and passengers about their citizenship and immigration status, and he may ask them to explain suspicious circumstances, *but any further detention or search must be based on consent or probable cause.*" Id., at 881–882 [95 S.Ct., at 2580]. . . . (emphasis added). Accord, *United States v. Martinez-Fuerte* [428 U.S. 543, 567, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976)].

442 U.S. at 208–12, 99 S.Ct. at 2254–56 (footnotes omitted). Analyzing the facts of the case before it, the *Dunaway* Court held that the intrusion involved in that case did not fit within the narrow exception to the probable cause requirement carved out in the *Terry* line of cases. It stated:

> In contrast to the brief and narrowly circumscribed intrusions involved in those cases, the detention of [Dunaway] was in important respects indistinguishable from a traditional arrest. [Dunaway] was not questioned briefly where he was found. Instead, he was taken from a neighbor's home to a police car, transported to a police station, and placed in an interrogation room. He was never informed that he was "free to go"; indeed, he would have been physically restrained if he had refused to accompany the officers or had tried to escape their custody.

*Id.* at 212, 99 S.Ct. at 2256. In summary, the Court concluded that "detention for custodial interrogation—regardless of its label—intrudes so severely on interests protected by the Fourth Amendment as neces-

sarily to trigger the traditional safeguards against illegal arrest." *Id.* at 216, 99 S.Ct. at 2258.

■ Though this case is factually distinguishable from *Dunaway*, we are confident that, under the reasoning employed in *Dunaway*, Markonni's request for Hill to accompany him to the Delta office constituted a significantly greater intrusion than a brief *Terry* stop and, thus, must be classified as an arrest requiring probable cause.[7] First, as in *Dunaway*, the intrusion in this case was not limited to brief on-the-spot questioning. The record reveals that, at the time Markonni requested Hill to accompany him to the Delta office, Markonni had already briefly interrogated Hill. At that point, Markonni asked Hill if he would consent to a search, and Hill told him "not without a search warrant." When Markonni told Hill that he had nothing to fear from a search if he was not carrying drugs, Hill again responded that he would not allow a search without a search warrant. It was only at this point that Markonni requested Hill to accompany him to the Delta office.[8] In our view, when Markonni requested Hill to come with him to the Delta office, the interrogation could no longer be characterized as "brief" or "on-the-spot." Rather, the request signaled the beginning of a more extended interrogation which was to occur in a place other than where it began.[9] Second, as in *Dunaway*, Hill was never informed that he was "free to go," and the circumstances surrounding the request indicate that Hill would have

---

7. Courts have refused to limit Dunaway's import to the particular circumstances involved in that case. *See, e. g., United States v. Blum*, 614 F.2d 537, 540 (6th Cir. 1980); *United States v. Chamberlin*, 609 F.2d 1318, 1323 (9th Cir. 1979); *United States v. Ashcroft*, 607 F.2d 1167, 1170 (5th Cir. 1979).

8. Thus, this case is distinguishable from cases such as *United States v. Oates*, 560 F.2d 45 (2d Cir. 1977), in which, for security and other reasons, the suspected drug courier was approached by DEA agents and was requested to accompany the agents to an interrogation room before any questioning occurred.

9. Some courts have held that it is lawful for an officer to take a suspect to a nearby office for

interrogation on the basis of reasonable suspicion as part of the *Terry* stop. *See, e. g., United States v. Chatman*, 573 F.2d 565 (9th Cir. 1977); *United States v. Oates*, 560 F.2d 45 (2d Cir. 1977). In our view, those cases are factually distinguishable in that they did not involve a situation in which a suspect had already been questioned, had refused to consent to a search, and was then requested to accompany the officer to another place. In addition, we note that the continued validity of the holdings of those cases is somewhat doubtful in view of the *Dunaway* Court's emphasis on the narrow scope of the *Terry* exception to the probable cause requirement.

been physically restrained if he had refused to accompany Markonni or had tried to escape his custody.[10] Third, as in *Dunaway*, the circumstances indicate that the detention involved here was for the purpose of interrogation.[11] In sum, the scope of the intrusion involved in Markonni's request for Hill to accompany him to the Delta office was significantly greater than that involved in a brief *Terry* stop, and therefore amounted to an arrest.

■ The district court specifically held that Hill did not consent to go with Markonni to the Delta office. The absence of consent distinguishes this case from *United States v. Mendenhall*, —— U.S. ——, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). The Court of Appeals in *Mendenhall* had held that the DEA agents' requests for Mendenhall to accompany them to the DEA office amounted to an arrest requiring probable cause. The Supreme Court did not reach the question whether, absent consent or probable cause, the request would have amounted to an arrest, for it upheld the district court's specific finding that Mendenhall "accompanied the agents to the office ' "voluntarily in a spirit of apparent cooperation," ' quoting *Sibron v. New York*, [392 U.S. 40, 63, 88 S.Ct. 1889, 1903, 20 L.Ed.2d 917 (1968)]." *Mendenhall*, —— U.S. at ——, 100 S.Ct. at 1879. Though the facts of *Mendenhall* are similar to those in this case, the district court was not clearly wrong in finding that Hill did not consent to accompany agent Markonni to the Delta office. Although Hill "was not told that [he] had to go to the office, but was simply asked if [he] would accompany [Markonni]"; "[t]here were neither threats nor any show of force"; Hill "had been questioned only briefly, and [his] ticket and identification were returned to [him] before [he] was asked to accompany [Markonni,]" *id.* at 1879; and, like Sylvia Mendenhall, Hill began to accompany Markonni without a verbal response; nevertheless, *unlike* Sylvia Mendenhall, Hill flatly refused to be searched without a warrant. In our view, that fact provides a basis for upholding the district court's factual conclusion that Hill did not consent to accompany Markonni to the Delta office. By the Government's own admission, no probable cause existed at the time Markonni requested Hill to accompany

10. Although neither the magistrate nor the district court specifically found that Hill was not free to go at the time of Markonni's request, we think that both assumed that Hill was not free to go. The Government never contended below that Hill was not free to leave. Both the magistrate and the district court characterized the initial contact between Markonni and Hill as an "investigatory *stop*." In addition, the only case cited by the magistrate for the proposition that Markonni's request was a valid "continuation of the investigation," *United States v. Oates*, 560 F.2d 45 (2d Cir. 1977), involved a situation in which the suspect was clearly *not* free to go. Finally, the district court specifically found that Hill did not consent to accompany Markonni to the Delta office. Thus, we think that the magistrate and district court implicitly found that Hill was not free to go at the time Markonni requested Hill to accompany him to the Delta office. In our view, even if Hill was free to go at the time of the initial contact, we cannot say that the district court clearly erred in its implicit finding that Hill was not free to go at the time of the request. Markonni asked Hill to accompany him to the Delta office immediately after Hill had twice refused to consent to a warrantless search. In light of Markonni's persistence after Hill indicated his unequivocal refusal to cooperate, we think that Markonni's words "carr[ied] an implication of obligation," *Dunaway*, 442 U.S. at 207 n. 6, 99 S.Ct. at 2253 n. 6. Under these circumstances, we cannot say that a reasonable person would have felt free to leave at the time of the request. Thus, we uphold the district court's implicit finding that Hill was not free to go at that time.

11. Though Markonni testified at the hearing on the motion to suppress that he intended to go to the Delta office in order to obtain a search warrant, the magistrate characterized the move to the Delta office as a continuation of the investigation, and the district court adopted that fact finding. At oral argument, the Government contended that Markonni intended to seek a warrant by telephone, but also indicated that Markonni intended to question Hill further. In addition, the Government's position is that Markonni did not have probable cause to search until Hill began running away, which seriously undermines the contention that Markonni's first objective was to seek a warrant. Under the circumstances, we do not hesitate to adopt the district court's finding that Markonni's request for Hill to accompany him to the Delta office was for the purpose of further interrogation.

him to the Delta office. Thus, under the circumstances of this case, neither consent nor probable cause is available as a justification for the intrusion. Therefore, we hold that agent Markonni violated Hill's fourth amendment rights when, after Markonni had questioned Hill briefly and Hill had twice refused to consent to a search in the absence of a search warrant, Markonni requested Hill to accompany him to the Delta office. Because the Government nowhere attempted to show that the PCP was obtained by any means other than exploitation of that illegality, which was its burden, the PCP is inadmissible as the tainted fruit of the unlawful arrest.

The judgment of the district court is REVERSED and the case is REMANDED for entry of an order granting Hill's motion to suppress and for further proceedings consistent with this opinion.