**UNITED STATES of America,
Plaintiff–Appellant,**

v.

**Francisco CORRAL–FRANCO, Maria Guadalupe Corral–Franco, and Maria Aparis Franco, Defendants–Appellees.**

No. 87–1483.

United States Court of Appeals,
Fifth Circuit.

June 22, 1988.

job qualification in this case <u>that age can stand as a proxy for</u>. (Bolding in original, underlining added.)

Thomas J. McHugh, Asst. U.S. Atty., El Paso, Tex., for plaintiff-appellant.

Robert R. Harris, El Paso, Tex., for Francisco Corral–Franco.

Salvador C. Ramirez, El Paso, Tex., for Maria Guadalupe Corral–Franco.

Robert F. Castaneda, El Paso, Tex., for Maria Aparis Corral–Franco.

Before GARWOOD and JONES, Circuit Judges, and HUGHES[*], District Judge.

GARWOOD, Circuit Judge:

The government appeals the district court's order suppressing as evidence 191 pounds of marihuana that United States Border Patrol agents found in the defendants' luggage at the El Paso International Airport. The district court ordered suppression on the ground that the marihuana in question was the fruit of an illegal arrest that occurred on the morning of February 25, 1987, at a departure gate at the airport. We conclude that the district court applied a legally incorrect test in determining that an arrest then occurred, and accordingly we vacate the suppression order and remand for reconsideration and findings under the appropriate test.

#### Facts and Proceedings Below

At approximately 7:10 a.m. on February 25, 1987, Border Patrol Agents Castillo, Lopez, and Gomez observed the defendants, Francisco Corral–Franco (Francisco), Maria Guadalupe Corral–Franco (Maria Guadalupe), and Maria Aparis Franco (Maria Aparis), entering the El Paso International Airport with six American Tourister suitcases. After entering the airport, the three defendants approached an airline ticket counter, checked in all six suitcases, and obtained boarding passes for a 7:45 a.m. flight to Chicago. The agents noticed that one of the defendants had what the agents believed to be Colombian features. Thus, as the defendants were proceeding to the boarding gate area, Castillo and Lopez approached them to inquire as to their citizenship.

Castillo identified himself to Francisco and Maria Guadalupe as an immigration officer, and questioned them as to their citizenship. Francisco presented an American passport and Maria Guadalupe apparently produced documents identifying her as a resident alien. Meanwhile, Lopez approached Maria Aparis and identified himself as an immigration officer. Maria Aparis produced a resident alien card. The defendants told the agents they were planning to return to El Paso after visiting Chicago for two or three days.

During the questioning, the defendants appeared nervous and tried to avoid making eye contact with the agents. Castillo asked Maria Guadalupe if she had checked any luggage and she replied that she had not. However, Francisco corrected her, stating that they had checked six suitcases. In response to similar questioning from Lopez, Maria Aparis, who was apart from the other defendants at this point, first stated that she had no luggage, and then stated that she had checked one suitcase. After determining the citizenship of the defendants, the agents decided to let them go. During the brief questioning, Gomez kept an eye on the six suitcases.

After the defendants left, Castillo and Lopez compared notes on their conversations. Both were suspicious of the defendants' nervousness and inconsistent responses. Castillo testified that such behavior closely resembled the behavior of drug smugglers he had encountered at the airport during his eight and a half years as a Border Patrol agent. Because of the suspicious behavior, the two agents decided to examine the six suitcases. The agents did not open the suitcases or place them under a magnetometer, but they did feel the suitcases and noticed that they felt solidly packed and equal in weight. The agents also noticed that the baggage claim tags, which bore the name "Ramirez," did not

---

[*] District Judge of the Southern District of Texas, sitting by designation.

have addresses, telephone numbers, or any other identifying information. The agents knew that none of the defendants were named Ramirez, and Castillo testified that he knew, based on experience, that suitcases containing marihuana often feel solidly packed. Believing the suitcases contained illegal drugs, the agents decided to take them to the Border Patrol office in the airport until the defendants could be questioned further.

Meanwhile, Francisco had gone to an airport coffee shop and the other two defendants were still at the boarding gate. At approximately 7:20 a.m., Lopez and another agent approached the defendants again and asked if they would be willing to accompany the agents to the airport Border Patrol office, which is down one floor and approximately 150 yards from the boarding gate. The agents did not purport to arrest the defendants, but they did administer oral *Miranda* warnings. The agents then went with the defendants to the airport Border Patrol office. There is no evidence that the agents told the defendants either that they were under arrest or that they were required to go to the airport Border Patrol office; nor is there any evidence that the agents touched the defendants or made any coercive gestures toward them. The defendants apparently did not ask if they were free to remain at or return to the gate or board the plane. Castillo testified that had they made such a request at that point they would not have been permitted to depart on the plane; however, there is no evidence that defendants were advised or otherwise aware of this.

About five minutes later, the agents and the defendants arrived at the airport Border Patrol office. The defendants were separated from each other and the agents again administered *Miranda* warnings. The defendants acknowledged an understanding of their rights and each read and signed a standard Warning of Rights form. Castillo testified that all three defendants then consented to an interview. Francisco was asked to empty his pockets as part of a standard inventory search, and he was found to be carrying $2,000, the airline tickets, the keys to the six suitcases, and

the baggage claim tickets matching those attached to the suitcases. His airline tickets were one-way to Chicago and not round-trip as the defendants had stated when they were first questioned by the agents. It appears that at some point after the defendants arrived at the airport Border Patrol office, one of the defendants asked permission to go to the restroom. Although she was allowed to go, she was escorted by one of the female baggage handlers from one of the airlines.

During the questioning, Francisco admitted that all six suitcases belonged to him. When asked what the suitcases contained, he replied, "You know." The agents asked him to explain, and he said, "You know, marihuana." Castillo testified that Francisco made this statement sometime between 7:50 and 7:55 a.m., but he also testified that Francisco admitted that the luggage contained marihuana sometime between 7:30 and 7:35 a.m. The agents then asked him for permission to search the luggage and he consented. According to Castillo, Francisco was asked for permission to search only once and he was told that he had the right to refuse. Castillo also testified that Francisco verbally consented to the search sometime around 7:35 a.m. At 7:55 a.m., Francisco signed a Consent to Search form, which he had read and which had been read to him.

Meanwhile, Maria Aparis initially denied ownership of the luggage but then admitted that she owned two suitcases. Maria Guadalupe claimed ownership of one. Both claimed that the suitcases contained clothing and then refused to answer any further questions. They were not questioned further. When the three defendants were reunited, the two women were told that Francisco had claimed ownership of all of the suitcases, and when he (Francisco) told the two women to tell the truth, they both admitted that he owned all six suitcases.

Francisco then agreed to open the suitcases. There is no evidence indicating that he was induced or coerced to do so. The agents sent for a photographer so that the suitcases could be photographed before and while being opened. When the photograph-

ers arrived, Francisco unlocked and opened the suitcases and they were found to contain approximately 191 pounds of marihuana. The suitcases were opened around 8:47 a.m., almost an hour after Francisco signed the Consent to Search form. Prior to this time, the defendants had not officially been arrested or charged with committing a crime.

All three defendants were subsequently indicted under 21 U.S.C. §§ 841(a)(1) and 846 for conspiracy to possess and for possession with the intent to distribute more than fifty kilos of marihuana. The defendants were also indicted under 18 U.S.C. § 1952(a)(3) for using an interstate carrier to conduct unlawful activity.

The defendants filed a motion to suppress the evidence found in the six suitcases, and a suppression hearing was held on May 22, 1987.[1] Castillo was the only witness. The district court granted the motion, finding that during the 7:20 a.m. encounter, when the agents, as the district court characterized it, "instructed" the defendants to accompany them to the airport Border Patrol office, the agents restricted the defendants' freedom and thus effectuated an informal "arrest" for which probable cause was required. The court further found that probable cause for the arrest was then lacking and that accordingly Francisco's consent to the search of the luggage was invalid as being the direct product of an illegal arrest and detention. The court therefore suppressed the marihuana found in the suitcases. This appeal followed.

### Discussion

To determine whether the defendants were arrested during the 7:20 a.m. encounter,[2] the district court looked to a four factor test that has often been used to determine whether a person has been "in custody" for *Miranda* purposes. Citing *United States v. Morin*, 665 F.2d 765, 769

(5th Cir.1982), the district court stated that the four relevant factors are: (1) whether the investigation had focused on the defendant; (2) whether the subjective intent of the officer conducting the interrogation was to hold the defendant; (3) whether the subjective belief of the defendant was that his freedom had been significantly restricted; and (4) whether probable cause had arisen to effect an arrest.

After listing the above four factors, the district court then stated that: "Applying these factors to the instant case, the Court finds that an arrest of all three Defendants was effected at approximately 7:20 to 7:25 a.m.," when the defendants were asked if they would accompany the agents from the departure gate to the airport Border Patrol office. The court determined that the investigation had then clearly focused on the three defendants. The court further found that it was then the subjective intent of the agents to detain the defendants until the agents were satisfied as to the contents of the suitcases. In addition, the court noted—though there was no direct evidence in this respect—that it was the defendants' "well-founded belief that their freedom had been restricted, and that they were not free to leave until the agents were through with them." Regarding the fourth factor, the district court noted that the agents lacked probable cause to arrest the defendants at the time of the 7:20 to 7:25 a.m. encounter. Based on these findings, the district court concluded that the agents had effected an arrest at that particular time.

In reviewing the district court's decision on a suppression hearing, we follow the rule that "the trial court's purely factual findings must be accepted unless clearly erroneous, or influenced by an incorrect view of the law." *United States v. Maldonado*, 735 F.2d 809, 813 (5th Cir.1984). In the latter event, remand is normally the appropriate course. *See Pullman–Stan-*

---

1. The government has not on this appeal raised any question as to the standing of any defendant to seek suppression of all or any part of the marihuana. We do not address that matter, nor whether it has been waived. However, our opinion herein is not itself intended to either

preclude or authorize the raising of such matter on remand.

2. The district court determined that in the earlier encounter at about 7:10 a.m. "no Fourth Amendment seizure occurred."

**540**

*dard v. Swint,* 456 U.S. 273, 102 S.Ct. 1781, 1789 & n. 17, 1792, 72 L.Ed.2d 66 (1982).

■ We conclude that the district court erred in applying the four factor test in this case. The court's application of that test is certainly understandable, as at the time of the suppression hearing it was the law of this Circuit in Fifth Amendment cases and we had also applied it in Fourth Amendment cases. However, since then we have rejected the "four factor" test, as "no longer compatible with Supreme Court precedent," and have replaced it with the "reasonable person" test to determine whether an individual not formally arrested is nevertheless in custody for purposes of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *See United States v. Bengivenga,* 845 F.2d 593 (5th Cir.1988). Under the latter test, one not formally arrested is deemed in custody if, but only if, "a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *Id.* The "reasonable person" for these purposes is one "neither guilty of criminal conduct and thus overly apprehensive nor insensitive to the seriousness of the circumstances." *Id.*

While *Bengivenga* was a Fifth Amendment case, we think its rationale is also controlling for Fourth Amendment purposes. *Bengivenga* used its "reasonable person" test to, in effect, distinguish between an investigative stop of the variety authorized in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) and its progeny, and the degree of restraint associated with formal arrest. These are, after all, both Fourth Amendment concepts. Moreover, our "four factor" test arose in the Fifth Amendment–*Miranda* context. *See United States v. Montos,* 421 F.2d 215, 223 (5th Cir.), *cert. denied,* 397 U.S. 1022, 90 S.Ct. 1262, 25 L.Ed.2d 532 (1970); *United States v. Phelps,* 443 F.2d 246, 247 (5th

Cir.1971); *Brown v. Beto,* 468 F.2d 1284, 1286 (5th Cir.1972); *United States v. Carollo,* 507 F.2d 50, 52 (5th Cir.), *cert. denied,* 423 U.S. 874, 96 S.Ct. 143, 46 L.Ed.2d 105 (1975); *Alberti v. Estelle,* 524 F.2d 1265, 1267 (5th Cir.1975), *cert. denied,* 426 U.S. 954, 96 S.Ct. 3181, 49 L.Ed.2d 1193 (1976); *United States v. Nash,* 563 F.2d 1166, 1168 (5th Cir.1977); *United States v. Warren,* 578 F.2d 1058, 1071 (5th Cir.1978) (en banc), *rev'd in part on other grounds,* 612 F.2d 887 (5th Cir.) (en banc), *cert. denied,* 446 U.S. 956, 100 S.Ct. 2928, 64 L.Ed.2d 815 (1980); *United States v. Williams,* 594 F.2d 86, 92 n. 12 (5th Cir.1979); *United States v. Henry,* 604 F.2d 908, 916–19 (5th Cir.1979); *United States v. Alvarado Garcia,* 781 F.2d 422, 425–26 (5th Cir.1986).

In *United States v. Brunson,* 549 F.2d 348, 356 n. 9 (5th Cir.), *cert. denied,* 434 U.S. 842, 98 S.Ct. 140, 54 L.Ed.2d 107 (1977), a Fourth Amendment case, we observed that the district court had applied the *Carollo* "four prong" test for *Miranda* custody to determine whether there was a seizure for Fourth Amendment purposes and that the parties had treated those questions as being the same. Although we reserved opinion as to whether every seizure equated to custody for *Miranda* purposes,[3] we thought "that the underlying inquiries are similar enough to justify the district court and the parties in their approach to this case." *Id.* In *United States v. Roberson,* 650 F.2d 84, 86 (5th Cir.1981), we applied the four factor test to determine whether there was an arrest so as to justify the challenged search as being incident thereto. In doing so, we relied only on *Williams, Warren,* and *Nash,* which had all applied the test exclusively for *Miranda* purposes. Similarly, in *Morin,* 665 F.2d at 769, we applied the four factor test (adding an additional factor) in determining whether a seizure was a *Terry* stop or an arrest for Fourth Amendment purposes, relying solely on *Warren,* which had applied the test only for *Miranda* purposes. And, in *United States v. Johnson,* 834 F.2d 1191,

**3.** In *Bengivenga,* we expressly rejected the possible implication from a later passage in *Brunson,* 549 F.2d at 357 n. 12, that *any* police seizure or restriction on freedom of movement calling into play the Fourth Amendment equated to custody for *Miranda* purposes; *Bengivenga* held instead that the restraint had to be of "the degree associated with formal arrest" as opposed to a mere *Terry* stop.

1194 (5th Cir.1987), similarly to *Roberson,* the four factor test was employed to hold that an arrest had occurred in determining whether a challenged seizure was incident to arrest. *Johnson* relied in this connection on *Morin, Roberson, Williams,* and *Warren,* the latter two being *Miranda* cases and the former two relying solely on *Miranda* cases. Accordingly, it is plain that our use of the four factor test in Fourth Amendment cases is entirely an outgrowth and reflection of our use of that test in *Miranda* cases. As we have now replaced the four factor test with the "reasonable person" test in *Miranda* cases, and in doing so have distinguished between *Terry* -type stops and full-fledged, albeit informal, arrests, it is inconceivable that we would continue to apply the four factor test in Fourth Amendment cases.

We therefore conclude that the appropriate test to determine whether the defendants had been in fact arrested in the 7:20 to 7:25 a.m. departure gate encounter and trip to the airport Border Patrol office is the "reasonable person" test of *Bengivenga,* and that the district court erred in employing the "four factor" test for this purpose. The district court's error in this regard may well have influenced its ultimate determination that the defendants were *de facto* arrested at the departure gate at 7:20 a.m. Thus, for example, the district court in finding an arrest had occurred at that time relied on the agents' subjective intent not to allow the defendants to depart on their flight without first satisfying the agents' suspicions about the luggage, although there was no evidence that this intent had been revealed to the defendants. Yet in *Bengivenga,* we ruled that "the unrevealed subjective intent of the law enforcement officers" in this respect is "irrelevant." [4] *See also United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 1877 n. 6, 64 L.Ed.2d 497 (1980). Similarly, the district court likewise relied on the fact that the investigation had then focused on the defendants. Again, however, *Bengivenga* teaches that this is relevant only insofar as it may "influence a reasonable person's perception of the situation." Here some, but *not* all, of the "focus" was apparent to the defendants. Hence, application of the four factor test may have led the district court to exaggerate the proper significance of "focus" in this case, particularly as our prior four factor decisions have indicated that is "the most compelling" of the four factors. *See Brown,* 468 F.2d at 1286.[5]

We conclude that the district court's finding that the defendants were arrested at the 7:20 to 7:25 a.m. departure gate encounter and the trip to the airport Border Patrol office was not made on the basis of

---

**4.** Moreover, even if the defendants had (correctly) understood that they were not then free to leave, such restraint would not of itself necessarily be equivalent to that of an arrest, as opposed to a *Terry* stop. *Bengivenga.*

**5.** We note that the degree of focus *revealed* to the defendants here appears to be less on this record than that in such cases as *United States v. Hill,* 626 F.2d 429 (5th Cir.1980), *Morin,* and *United States v. Berry,* 665 F.2d 765 (5th Cir. 1982) (Unit B). In *Hill,* we relied on the fact that before the asserted *de facto* arrest the agent had twice requested, and the defendant had twice refused, permission to search his person for narcotics. 626 F.2d at 431, 435 n. 9, 436 n. 10. In *Morin,* the defendant was twice stopped before the "informal" arrest, the first time refusing a request to search his bag by an officer who said he was "on the narcotics detail," and the second time being informed (while using the rest room) that he was suspected of carrying narcotics, his identification and ticket being then taken from him and retained. 665 F.2d at 767. In *Berry,* the agents had already exposed to one defendant his use of false identification,

asked the other if she wanted to change her answer about her name, and then asked both if they "were carrying drugs." 670 F.2d at 588–89. *Cf. Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 1322, 75 L.Ed.2d 229 (1983) (agents announced to defendant they suspected him of transporting narcotics and retained his tickets and identification; he was then asked to accompany them to a room which one witness described as a "large storage closet").

We also observe that the district court here apparently regarded the *absence* of probable cause as a factor indicative of arrest under the four factor test. However, under that test it is the *presence* of probable cause which is indicative of *de facto* arrest. *See Alvarado Garcia,* 781 F.2d at 426; *Warren,* 578 F.2d at 1071–72. Under the "reasonable person" test, the *presence* or *absence* of probable cause is relevant only to the extent that it may "influence a reasonable person's perception of the situation." *Bengivenga.* Here, the *absence* of probable cause is accordingly either neutral or indicative of no arrest.

the prescribed "reasonable person" test and was apparently influenced by its reliance on the now discredited four factor test, and that accordingly remand is called for so that the district court may make findings appropriate to the "reasonable person" test and determine thereunder, rather than under the four factor test, whether the defendants were *de facto* arrested prior to Francisco's statement to the agents that the luggage contained marihuana. And in this connection, we do not preclude the district court from reopening the evidence, should it deem that appropriate.[6]

## Conclusion

Accordingly, the suppression order is vacated and the cause is remanded for reconsideration of and new findings on the suppression motion, with appropriate consequent order thereon, and for any further proceedings in connection therewith as may be appropriate and not inconsistent herewith.

VACATED and REMANDED.

HUGHES, District Judge, dissenting:

This case is being remanded for the district court to reconsider the evidence on suppression in light of the newly-enunciated test in *United States v. Bengivenga*, 845 F.2d 593 (5th Cir.1988), for determining whether there has been an arrest. I dissent.

The district court could have reached the same result it did originally under the "rea-

---

**6.** The *only* evidence at the suppression hearing (other than signed consent and warning forms) was the testimony of Agent Castillo, who was *not* present at the asserted departure gate arrest nor on the walk from there to the airport Border Patrol office (we recognize, of course, that hearsay may generally be considered at such hearings, *see United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974)). None of the defendants testified (or presented any evidence), although had they done so their testimony could not have been used against them (apart from impeachment) at trial on the merits. *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 974–76, 19 L.Ed.2d 1247 (1968). In this context, we are puzzled by the district court's finding that at the 7:20 a.m. encounter the agents "instructed" the defendants to accompany them to the airport Border Patrol office. There is simply no evidence that the defendants were "instructed" or "told" or "required" to do anything at that point. The only evidence on this score is the following from cross-examination of Agent Castillo (who was not present during this encounter):

"Q. Verbally they read them their rights there in the terminal area, in the loading area?
"A. Yes, sir.
"Q. Then apparently they asked them to come with them to the office.
"A. Negative, sir. We usually ask them *if they are willing* to accompany us to the office, pending further interview regarding the contents of the luggage. *After they consented,* they were given their rights verbally and they escorted the officers down to the Border Patrol office.
"....
"Q. So then they are escorted, politely, but they are escorted back to the office, Customs Office by those two agents?

"A. They went with the officers *voluntarily,* yes, sir.
"....
"Q. You testified earlier that they were read their warnings upstairs, is that correct?
"A. Yes, after *they agreed* to accompany the officers to the office.
"Q. Isn't it a fact that the officers told them, 'You accompany us' and took them downstairs?
"A. That's not the way we operate." (Emphasis added.)

While the government has the burden of proving that the defendants voluntarily accompanied the agents (at least if that is crucial to the government's case), *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 1879, 64 L.Ed.2d 497 (1980), the district court did not say that it discredited Castillo's testimony or determined that the government failed to carry this burden; rather, it affirmatively found as a fact—but without any evidentiary support—that the agents "instructed" the defendants to accompany them. We also observe that the district court, in finding an arrest at 7:20 a.m., relied on the fact that the defendants' flight "departed at 7:45 a.m. without them" (this was the scheduled departure time; there is no evidence of just when the plane actually departed). But this was clearly *after* the asserted arrest, and under one view of the evidence (not resolved by the district court) Francisco's statement to the agents that the luggage contained marihuana (which doubtless gave rise to probable cause) came at a time when it was *still possible to* catch the plane (further, it does not appear that the defendants' tickets had been taken or that they were aware, before arriving at the office, that their luggage was there). On remand, the district court should also clarify its findings in these respects.

sonable person" test of *Bengivenga;* the trial court specifically found that the Corral–Francos' belief that they were under arrest at 7:20 a.m. when they were led from the airport concourse to the border patrol office was well-founded. The trial court's conclusion that the defendants' beliefs were justified satisfies the requirement that an innocent, similarly situated individual would have believed he was not free to leave.

A chief reason for adopting the objective test of *Mendenhall* was to prevent over reliance on self-serving declarations of police officers. *Bengivenga,* at 598. In the case of the Corral–Francos, an immigration officer with eight and one-half years of field experience testified that the Corral–Francos were not free to leave his custody. If anything, this is the most reliable testimony. Insisting that the trial court reformulate its findings in the verbiage of a "reasonable person" analysis when the evidence unequivocally shows that the officer subjectively believed he was making an arrest and the court found this was effectively conveyed to the defendants through the agent's conduct places an unnecessary semantic exercise on the trial court.

The emphasis in footnote 6 on the trial court's failure to express his disbelief of Castillo's characterization of the encounter is troublesome; the finding of "instructed" carries a strong implication that Castillo was not credible. The court could rely on the common-sense inference that people ordinarily do not voluntarily jeopardize their travel arrangements on casual, polite requests for an interrogation in an office out of sight shortly before their flight is to depart.

Although the trial court in *Bengivenga* applied the four-part test of *Morin,* which was held to be a legally incorrect test, the case was not remanded for the application of a "reasonable person" test presumably because the district judge's findings support the new articulation of the rules, leaving a legally proper result. This case need not be remanded, in spite of the newly-worded legal standard, because the facts of this case mandate suppression under either the *Morin* or *Bengivenga* test. To hold otherwise is inconsistent with *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), a factually closer case than *Mendenhall.* In America, a non-paranoid innocent traveler who (1) is stopped 25 minutes before his plane is to depart because he looks nervous and has given conflicting accounts about how much luggage he has checked; (2) is led to another floor of the airport by three agents into a law enforcement office out of the public view; (3) has had luggage seized; (4) has *Miranda* warnings administered; (5) has airline tickets and money taken away in the office; and (6) has no chance of boarding his plane until his luggage is inspected, would reasonably think he is in police custody under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). It was not until after their plane had departed that Corral–Franco signed the consent form, and even if they could have made the airplane, their trip would have been seriously disrupted by the absence of their luggage at the destination. In light of these facts, the question whether they were under arrest would be answered affirmatively under any particular articulation of the standard.

As Judge Goldberg said in *Bengivenga,* the new standard must be applied consistently with the underlying principles in *Miranda v. Arizona.* Unless this is done, courts may reach conflicting results on strikingly similar facts.