**UNITED STATES of America,**
**Plaintiff-Appellant,**

v.

**Jesus ESPINOSA–GUERRA,**
**Defendant-Appellee.**

**No. 86–8057.**

United States Court of Appeals,
Eleventh Circuit.

Dec. 16, 1986.

Julie E. Carnes, Asst. U.S. Atty., Atlanta, Ga., for plaintiff-appellant.

Stephanie Kearns, Federal Public Defender, Atlanta, Ga., for defendant-appellee.

Before KRAVITCH and CLARK, Circuit Judges, and HENDERSON, Senior Circuit Judge.

CORRECTED OPINION

KRAVITCH, Circuit Judge:

The United States appeals from the district court's order suppressing cocaine [1] discovered in a search of a small bag which defendant/appellee Jesus Espinosa-Guerra was carrying while awaiting a flight at the Atlanta airport. The district court concluded that the evidence must be suppressed because appellee had been seized without reasonable suspicion or, alternatively, arrested without probable cause. We reverse.

---

1. The United States may appeal from a district court order suppressing evidence. 18 U.S.C. § 3731.

We find the district court's factual determinations, with the exceptions noted,[2] are supported by the record. Because the progression of events leading to the search is critical to the resolution of this case, we discuss the facts in some detail.[3]

In the early evening hours of July 16, 1985, appellee arrived at the Atlanta airport on a non-stop Delta flight from Miami. Paul Markonni, a highly experienced special agent with the Drug Enforcement Administration (DEA),[4] observed appellee deplane and approach a Delta ticket agent. Appellee held his ticket up to the agent and said "Detroit?". Agent Markonni observed: that appellee's ticket was issued in the name of Carlos Valdez; that there were no claim checks for baggage attached to the ticket jacket; that appellee was unshaven and appeared as though he had been in the same clothes for an extended period of time; and that appellee was carrying a small tote bag. The ticket agent told appellee "Gate 28" and pointed in the direction of the gate where the flight to Detroit was to depart some time later.

As appellee proceeded to Gate 28, Agent Markonni went to the Delta ticket counter to investigate. Markonni retrieved appellee's ticket reservation record and discovered that appellee had purchased the ticket approximately two hours prior to the flight's departure from Miami and that a south Florida telephone number was listed as his home call back number. Markonni telephoned the number and asked for Carlos Valdez. The voice at the other end denied any knowledge of anyone by that name.

Agent Markonni then went to Gate 28 to attempt to interview appellee. Dressed in casual civilian clothes, displaying no weap-

ons, and speaking in a normal tone of voice, Markonni presented his credentials and identified himself to appellee as a law enforcement officer. Markonni asked appellee if he could speak with him for a few minutes. Appellee said yes. When Agent Markonni then asked to see appellee's airline ticket, appellee appeared not to understand and did not produce the ticket. Agent Markonni repeated the word "ticket," at which point appellee handed his ticket to Markonni. In examining appellee's ticket, Agent Markonni confirmed his earlier reading of the ticket and noted that the ticket had been purchased with cash and that no baggage claim checks were attached.

Agent Markonni then attempted to obtain information regarding appellee's identity. First, he asked appellee "what is your name?". Appellee did not respond. Markonni pointed to the name Carlos Valdez on the ticket and then pointed to appellee. Appellee responded, "Yes, Carlos Valdez." Markonni returned the ticket to appellee and asked him for identification or a passport. Appellee said "no." The agent pulled out his wallet, pointed to it, and then pointed at appellee. Appellee responded "nada." Markonni asked appellee if he spoke any English. Appellee said "no."

After these attempts to communicate with appellee had failed, Agent Markonni said "Momento, por favor,"[5] and made a motion with his hand to suggest that appellee should follow him. Markonni wanted to telephone a Spanish speaking immigration officer at the airport who could speak with appellee to ask Markonni's questions. Appellee walked down the hall at Agent Markonni's side.[6] After Markonni discovered that he had no change to use the pay

---

**2.** Certain of the district court's findings regarding Agent Markonni's conduct immediately upon entering the Delta office are clearly erroneous. *See infra* note 9.

**3.** We have augmented the district court's findings with additional uncontroverted facts from Agent Markonni's testimony at the suppression hearing.

**4.** Agent Markonni has over 17 years of law enforcement experience and has participated in

over 600 arrests at airports for drug related offenses.

**5.** "Momento, por favor" is Spanish for "one moment please." Agent Markonni speaks only "a little" Spanish; he is not fluent in Spanish.

**6.** Neither appellee nor Agent Markonni spoke during the walk down the hallway.

---

telephone fifteen or twenty feet down the hall, Markonni and appellee walked to the Delta Airlines office [7] located sixty-five or seventy feet down the hall from the point where the walk began.[8]

Upon entering the Delta office,[9] Agent Markonni telephoned the United States Immigration and Naturalization Service (INS) office at the Atlanta airport.[10] Markonni spoke to Inspector Buskey, whom Markonni knew was fluent in Spanish. Markonni asked Inspector Buskey to speak with appellee in Spanish. Markonni requested that Buskey inform appellee of Agent Markonni's identity, ask the questions Markonni would normally ask,[11] and inquire if Markonni could search appellee's person and his tote bag. Agent Markonni then handed the telephone receiver to appellee.

Inspector Buskey identified himself and questioned appellee in Spanish. In response to Buskey's questions, appellee said that his name was Valdez, that he was a Mariel Cuban, and that he had no identification of any kind. Inspector Buskey knew that federal immigration law makes it a criminal offense for Mariel Cubans not to have certain parole documents on their person at all times.[12] Buskey asked appellee if he objected to Agent Markonni searching his luggage. Appellee responded that he did object and would not consent to such a search. Appellee then handed the telephone receiver back to Markonni.

After relating the details of what appellee had said, Inspector Buskey instructed Agent Markonni to detain appellee and bring him to the Immigration office. Mar-

---

**7.** The office was not open to the public. Delta used the office as a lounge for passengers who are ill or otherwise need a place out of public view. The office, about 12 feet by 14 or 16 feet, contained a desk, a chair, a couch, and a telephone. The room had a door with a lock.

**8.** Agent Markonni knew that there was a telephone he could use in the Delta office. The telephone in the Delta office was the nearest telephone available that did not require coins to operate.

**9.** The district court's finding that "[u]pon arriving, Markonni asked the employee present to leave, and he shut the door behind him," was clearly erroneous. Construing the evidence in the light most favorable to appellee, we are left with a definite and firm conviction that a mistake has been committed, see *United States v. Edmondson*, 791 F.2d 1512 (11th Cir.1986), because there was no evidence to support these conclusions.

The only evidence before the court regarding the circumstances surrounding Agent Markonni's entry into the office was the testimony of Agent Markonni at the suppression hearing before the magistrate. This testimony was as follows:

Q: Is there a lock on [the office] door?
A: I'm sure there is.
Q: When you and Mr. Espinosa were inside was the door locked, to your knowledge?
A: No.
Q: Was the door open or closed?
A: I don't recall; it might have been closed.
Q: Was anyone else present?
A: No.

On cross-examination, Agent Markonni was asked:

Q: Was there anyone else present in the lounge when you entered it?
A: I don't know. There may have been a Delta Air Lines agent in the lounge that I asked to leave. I honestly don't recall. We were the only two in there when I was on the telephone to Immigration.
Q: If there was you asked them to leave when you entered?
A: Yes.

These equivocal statements alone are insufficient to form any factual findings as to: (1) whether anyone was present when Markonni arrived at the office; or (2) whether the door was open or closed when Markonni made the telephone call. The court's findings, therefore, are clearly erroneous because they are without any support in the record.

The rationale for the district court's leap from equivocal testimony to firm factual finding is apparent in the court's conclusion that "Markonni's actions in ushering the defendant into the Delta Airlines office, asking the person present to leave, and closing the door constituted a significantly greater intrusion than a brief *Terry* stop and, thus, must be classified as an arrest requiring probable cause." We address *infra* the issue of whether the court's conclusion that an arrest occurred may be sustained absent the unsupported factual premises.

**10.** The Immigration office was located one concourse over from concourse A, where the encounter occurred.

**11.** These include: appellee's name; appellee's address; and the nature of appellee's presence in the United States.

**12.** *See* 8 U.S.C. § 1304(e).

konni told appellee to sit, and then telephoned for a City of Atlanta uniformed police officer to transport appellee in a police vehicle to the Immigration office.[13]

When appellee, Agent Markonni, and the Atlanta officer arrived at the Immigration office, Inspector Buskey identified himself and again inquired as to appellee's status in the United States. Appellee maintained that he was a Mariel Cuban, but said that he had left his documentation in his car in Detroit. At that point, Buskey searched appellee's personal effects for identification and evidence of alien registration. Inside appellee's tote bag, Inspector Buskey found clothing and a hard object wrapped in a towel.[14] Inside the towel, Buskey discovered a package wrapped completely with masking tape.

Buskey turned the package over to Agent Markonni, who testified that, without opening the package, he noticed that the substance inside had the odor and consistency of cocaine. Markonni cut a small slit in the package [15] and confirmed his suspicion. Markonni then placed appellee under arrest for possession of cocaine with intent to distribute. 21 U.S.C. § 841.

The district court referred appellee's motion to suppress to a United States magistrate. After a hearing, the magistrate filed a report and recommendation that the motion to suppress be denied. Appellee timely objected to the magistrate's report and recommendation. The district court rejected the magistrate's recommendation and ordered the evidence suppressed.

## I.

The preliminary issue that must be decided is what level of fourth amendment protection, if any, was implicated by Agent Markonni's conduct. It is now well established that not all police-citizen encounters

are within the protective scope of the fourth amendment. *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion); *United States v. Alvarez-Sanchez*, 774 F.2d 1036 (11th Cir. 1985); *United States v. Brown*, 731 F.2d 1491, *modified*, 743 F.2d 1505 (11th Cir. 1984).

■ In *United States v. Berry*, 670 F.2d 583 (5th Cir. Unit B 1982) (en banc),[16] we identified three tiers of police-citizen encounters with respect to the fourth amendment: (1) police-citizen communications involving no coercion or detention; (2) brief "seizures;" and (3) full scale arrests. *Id.* at 591. The first category of consensual encounters does not implicate fourth amendment scrutiny. *Id.* The second category involves reasonably brief encounters in which a reasonable person would have believed that he or she was not free to leave. *Immigration and Naturalization Service v. Delgado*, 466 U.S. 210, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984). In order to justify such a fourth amendment "seizure," the government must show a reasonable, articulable suspicion that the person has committed or is about to commit a crime. *Florida v. Rodriguez*, 469 U.S. 1, 105 S.Ct. 308, 310, 83 L.Ed.2d 165 (1984). Finally, when the totality of circumstances indicate that an encounter has become too intrusive to be classified as a brief seizure, the encounter is an arrest and probable cause is required. *Florida v. Royer*, 460 U.S. 491, 499–500, 103 S.Ct. 1319, 1325–26, 75 L.Ed.2d 229 (1983) (plurality opinion).

■ The district court focused upon the portion of the encounter where Agent Markonni: signalled appellee to follow him; walked down the hall to the Delta office with appellee; and brought appellee into the office where Markonni used the tele-

---

**13.** Agent Markonni did not search or handcuff appellee prior to arriving at the Immigration office.

**14.** Inspector Buskey testified that documents are often concealed by being wrapped in pieces of clothing.

**15.** Inside the masking tape was a plastic zip-lock bag that contained cocaine.

**16.** The Eleventh Circuit, in *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir.1982), adopted as precedent decisions of the former Fifth Circuit, Unit B, rendered after September 30, 1981.

phone. The court correctly determined that Markonni's initial stop of appellee up to the point when Markonni gestured for appellee to follow him, did not implicate the fourth amendment. A police officer may approach an individual in a public place, identify himself as a law enforcement officer, and, in a non-coercive manner, ask the individual a few questions, without converting the encounter into a seizure. *Florida v. Rodriguez*, 469 U.S. 1, 105 S.Ct. 308, 310, 83 L.Ed.2d 165 (1984); *Royer*, 460 U.S. at 497, 103 S.Ct. at 1324. The district court concluded, however, that at the time Markonni gestured for appellee to follow him, appellee did not reasonably believe himself free to leave and a seizure or an arrest occurred. We first address the seizure issue.

■ We agree with appellee and the district court that appellee was seized because, from the time that Agent Markonni gestured for appellee to follow him, the totality of circumstances indicate that a reasonable person in appellee's position would have not believed that he was free to leave. *United States v. Berry*, 670 F.2d 583, 595 (5th Cir. Unit B 1982) (en banc). In *Berry*, we held that close scrutiny for

the presence of coercion in airport stops is required because the very nature of airport stops renders them intimidating. *Id.* at 596–97. In order to find that no seizure occurred, courts should "scrutinize the record with care to ensure that the totality of the circumstances shows an utter absence of coercion and hence truly voluntary consent." *United States v. Elsoffer*, 671 F.2d 1294, 1297 (11th Cir.1982). In examining the totality of circumstances to determine if a reasonable person would feel free to leave, several actions by law enforcement officials in the context of airport stops have been identified as potentially coercive.[17] An officer's asking an individual to accompany him or her to an office is an intrusive request that raises a presumption that the individual would not feel free to leave absent "exceptionally clear evidence of consent." *United States v. Alvarez-Sanchez*, 774 F.2d 1036, 1041 (11th Cir. 1985); *United States v. Robinson*, 690 F.2d 869, 877 (11th Cir.1982); *United States v. Berry*, 670 F.2d 583, 598 (5th Cir. Unit B 1982) (en banc).

We find no exceptionally clear evidence of appellee's consent to accompany Agent Markonni to the Delta office.[18] First, ap-

---

**17.** *See, e.g., Florida v. Royer*, 460 U.S. 491, 501–502, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983) (officer identifying himself as a narcotics agent, officer announcing that defendant is suspected of transporting narcotics, officer requesting that defendant accompany him to a police room, officer retaining airline ticket and drivers license, officers not indicating in any way that defendant is free to depart) (plurality opinion); *United States v. Mendenhall*, 446 U.S. 544, 555–56, 100 S.Ct. 1870, 1877–78, 64 L.Ed.2d 497 (1980) (threatening presence of several officers, display of a weapon by an officer, officer physically touching defendant's person, officer's use of language or tone of voice indicating that compliance with the officer's request might be compelled, officers wearing a uniform, officers summoning defendant to their presence) (opinion of Stewart, J.); *United States v. Lopez-Pages*, 767 F.2d 776, 779–80 (11th Cir.1985) (officers retaining defendant's airline ticket, officer informing defendant that he fit hijacker profile and would be searched); *United States v. Elsoffer*, 671 F.2d 1294, 1297 (11th Cir.1982) (officers retaining defendant's airline ticket and driver's license); *United States v. Berry*, 670 F.2d 583, 597 (5th Cir. Unit B 1982) (officers blocking an

individual's path or otherwise intercepting him to prevent his progress in any way, officer retaining defendant's airline ticket, officer stating that defendant is suspected of smuggling drugs, officer informing defendant that an innocent individual would cooperate with police, officers asking defendant to accompany them to an office).

**18.** The trial court's determination of whether "a reasonable person would have believed that he is not free to leave" is a question of law application for *de novo* review. The district court's findings of fact that bear on this larger question, including findings as to whether a verbal consent is voluntary, are subject to the "clearly erroneous" standard. *See United States v. Alvarez-Sanchez*, 774 F.2d 1036 (11th Cir.1985); *United States v. Lopez-Pages*, 767 F.2d 776 (11th Cir.1985); *United States v. Robinson*, 690 F.2d 869 (11th Cir.1982). No verbal consent is present in this case. We note, however, that courts assessing voluntariness of consent have a duty to scrutinize verbal agreements "exceptionally closely to ensure a complete absence of coercive influence." *United States v. Berry*, 670 F.2d 583, 598 (5th Cir. Unit B 1982) (en banc).

# 1508

pellee did nothing more than silently acquiesce to Agent Markonni's gesture. Silently following an officer almost never constitutes sufficient evidence of consent. *Id.* Second, Agent Markonni did identify himself and present his DEA credentials. Although Markonni's act of identifying himself did not, without more, convert the encounter into a seizure,[19] it is certainly a factor in the totality of circumstances to be considered in examining the evidence of consent. Most fundamental, however, is the fact that the agent and appellee were not able to communicate. Appellee spoke no English, and Agent Markonni spoke almost no Spanish. It is not at all clear that appellee understood Markonni's questions or his intent.[20] In such circumstances, no exceptionally clear evidence of consent appears, and the presumption that a reasonable person would not feel free to leave is not rebutted.

## II.

■ Although we conclude that Agent Markonni's actions amounted to a seizure, appellee's fourth amendment rights were not violated if the seizure was supported by reasonable, articulable suspicion. The district court apparently rejected the magistrate's recommendation on this issue[21] because there was no evidence that appellee had appeared nervous or had behaved in an unusual manner, and there was no evidence of a suspicious bulge on appellee's person. Although evidence of the type identified by the district court would be relevant to the determination of whether reasonable suspicion existed, such evidence is not required. What is required are "specific and articula-

ble facts which, taken together with rational inferences from those facts, reasonably warrant [an] intrusion." *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968).

■ We find that, considering the totality of circumstances, appellee's detention was supported by reasonable suspicion. First, Markonni knew that appellee was arriving on a non-stop flight from Miami, a significant drug distribution site. Second, Markonni observed that appellee appeared to have spent an extended period of time in the same clothes and was unshaven. In Markonni's experience, drug deals are often delayed, causing participants to have to stay in a location longer than anticipated without an opportunity to shave or change clothing. Third, Markonni noticed that appellee had no baggage claim checks attached to his ticket and that appellee was carrying only a small tote bag. Markonni knew that drug dealers often travel with little or no baggage on relatively long trips because they often fly into a city intending to take the next flight back. Fourth, Markonni learned that appellee had purchased his ticket just two hours prior to the flight's departure and that the ticket was purchased with cash. Fifth, Markonni dialed the telephone number that appellee listed as his home call-back number but the person answering denied any knowledge of anyone by the name appellee had used to make the reservation. In Markonni's experience, use of a false name is common among drug dealers. Finally, appellee claimed to have no identification of any kind despite the fact that he was traveling a long distance and did not speak English.

19. *Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983) (plurality opinion).

20. In *United States v. Alvarez-Sanchez,* 774 F.2d 1036, 1042 n. 8 (11th Cir.1985), we recognized the possibility that a language barrier could be a factor indicating that an individual did not feel free to leave when an agent requested that he accompany him to an office. This factor did not play a role in *Alvarez-Sanchez,* however, because the law enforcement officer was able to communicate with Alvarez-Sanchez in Spanish.

21. The district court's assertion that the magistrate's report supports its conclusion that Agent Markonni lacked reasonable suspicion to believe that appellee was committing a crime is without support. The magistrate found that "[a]lthough defendant was detained or seized, the testimony indicates that this seizure was not unreasonable." Taken out of context, the magistrate's language quoted by the district court suggests that the magistrate found a constitutional violation; it is obvious, however, in later portions of the report and in the magistrate's recommendation that he found no fourth amendment violation.

We hold that these specific and articulable facts were sufficient to make the seizure not unreasonable.

### III.

■ The final issue for our consideration is the question of when the encounter ripened into an arrest. The Supreme Court has made it clear that the line between an investigative stop and an arrest cannot be determined by any *per se* rule. *United States v. Sharpe*, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). Instead, in determining whether an investigative detention is unreasonable, "common sense and ordinary human experience must govern over rigid criteria." *Id.*, 105 S.Ct. at 1575. The *Sharpe* decision emphasized the importance of the brevity of the detention, the law enforcement purposes to be served by the detention, and the time reasonably needed to effectuate those purposes. *Id.*

We begin with the recognition that when a law enforcement officer asks an individual to accompany him or her to an office, it is a serious intrusion upon the individual's personal liberty. As the en banc court stated in *Berry:*

> Requiring an individual to accompany police to an office indicates a detention for a time period longer than that permitted in a seizure; cuts the individual off from the outside world, without indication of when he might be allowed to leave; places him in unfamiliar surroundings; may subject him to increased implicit police pressure; and leaves him without

third parties to confirm his story of events that may have occurred, should his story differ from that of the police. Such a detention, if not by consent—and, as we noted earlier, courts should scrutinize exceptionally closely whether consent in fact was voluntary in such situations—we believe is only constitutional if accompanied by probable cause.

*United States v. Berry*, 670 F.2d 583, 602 (5th Cir. Unit B 1982) (en banc); *accord, United States v. Hill*, 626 F.2d 429 (5th Cir.1980).[22] We reaffirm the *Berry* message to law enforcement officials that "[t]he limited interrogation permissible during a seizure can be conducted as well in an airport concourse as in an office, as can a request for consent to a search." *Id.*

■ We do not, however, read *Berry* or *Hill* as being contrary to the *Sharpe* admonition against per se rules for when a seizure becomes an arrest. Indeed, *Berry* identified two considerations that circumscribe the limits of a seizure: first, a balancing test weighing the government interest involved against the intrusion on the individual; second, consideration of whether the scope of the search is strictly tied to and justified by the circumstances which rendered its initiation permissible.[23] *Berry*, 670 F.2d at 601–02. These considerations are consistent with Supreme Court precedent.[24]

■ We hold that, in the special factual circumstances of this case, the encounter between Agent Markonni and appellee did

---

**22.** The Eleventh Circuit, in the en banc decision *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

**23.** *See also United States v. Elsoffer*, 671 F.2d 1294 (11th Cir.1982).

**24.** *See, e.g., Terry v. Ohio*, 392 U.S. 1, 19–20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968) ("in determining whether [a] seizure and search were 'unreasonable' our inquiry is a dual one— whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place"); *United States v. Mendenhall*, 446 U.S. 544, 561, 100 S.Ct. 1870, 1881 (1980) ("reasonableness of a

stop turns on the facts and circumstances of each case. In particular, the Court has emphasized (i) the public interest served by the seizure, (ii) the nature and scope of the intrusion, and (iii) the objective facts upon which the law enforcement officer relied in light of his knowledge and expertise") (Powell, J., concurring); *Florida v. Royer*, 460 U.S. 491, 506–07, 103 S.Ct. 1319, 1329, 75 L.Ed.2d 229 (1983) ("We do not suggest that there is a litmus-paper test for ... determining when a seizure exceeds the bounds of an investigative stop. Even in the discrete category of airport encounters, there will be endless variations in the facts and circumstances, so much variation that it is unlikely that the courts can reduce to a sentence or a paragraph a rule that will provide unarguable answers to the question whether there has been an unrea-

not exceed the bounds of an investigative stop until Markonni told appellee to sit down to wait for an officer to transport him to the INS office. First, the government had a substantial interest in being able to question appellee. We concluded above that Agent Markonni had reasonable suspicion that appellee was transporting drugs. Without an interpreter, Markonni was not able to communicate with appellee. Second, Agent Markonni acted diligently to obtain an interpreter. He brought appellee to the nearest means by which he could obtain the assistance of an interpreter.[25] Finally, the seizure was limited in scope to that reasonably necessary to effectuate the purposes of the stop. Agent Markonni used no force,[26] he did not retain appellee's

airline ticket or identification, and he only asked appellee to walk with him sixty-five or seventy feet down the hallway. In short, the seizure was a necessary and minimally intrusive extension of the lawful investigative questioning.[27] Therefore, we hold that appellee was not arrested until Inspector Buskey instructed Markonni to bring appellee to the INS office. At that point, Inspector Buskey had probable cause to believe that appellee had violated the immigration laws and Buskey directed Markonni to formally detain appellee for more extensive interrogation at the INS office.[28]

## IV.

We conclude, therefore, that the judgment of the district court granting the mo-

sonable search or seizure in violation of the Fourth Amendment.") (plurality opinion).

**25.** Although Agent Markonni might have avoided the need to walk the additional distance to the Delta office if he had had change for the pay telephone, to rely upon this lack of foresight as necessitating a finding that appellee was arrested would constitute precisely the type of *post hoc* judicial second-guessing that the Court disapproved in *Sharpe.* As the Court stated:

A creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished.... The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it.

*United States v. Sharpe,* 470 U.S. 675, 105 S.Ct. 1568, 1576, 84 L.Ed.2d 605 (1985).

**26.** Agent Markonni did not at any point physically touch appellee. In addition, Agent Markonni was dressed in casual civilian clothes, he displayed no weapons, and he spoke in a conversational tone of voice.

**27.** Our result is not inconsistent with prior decisions finding that transporting a suspect to an office constitutes an arrest. In *United States v. Hill,* 626 F.2d 429 (5th Cir.1980), the former Fifth Circuit held that Agent Markonni's action in requesting that a suspect accompany him to an office was an arrest. *Hill* is, however, distinguishable in that there was no language barrier preventing communication between Agent Markonni and the suspect. In *Hill,* Agent Markonni had interrogated the suspect prior to requesting that he accompany Markonni to the office. The court distinguished a Second Circuit case in

which "for security and other reasons" the suspected drug courier was asked to accompany agents to an interrogation room *before* any questioning occurred. *Id.* at 435 n. 8. We believe that this footnote contemplates the possibility that where a language barrier prevents *any* questioning, a trip to a nearby office might not constitute an arrest. There is a fundamental difference between a trip to an office to enable questioning that is not otherwise feasible and a trip to an office to enable further or more effective interrogation.

Similarly, *United States v. Berry,* 670 F.2d 583 (5th Cir. Unit B 1982), is not contrary to our narrow holding. Although the facts of *Berry* did not present the issue, the court stated that:

Though it is arguable that security reasons might justify taking a suspect to an office during a seizure, circumstances indicating such a justification would be exceptional. We have difficulty believing the noise level in an airport to be so high as to prevent normal uncoercive conversation.

*Id.* at 603 n. 24 (citation omitted).

The situation in this case is similar to an airport that is so noisy as to make conversation impossible. The office was not being used as a police tool for more intrusive interrogation. Instead, the office was used as a necessary and minimally intrusive means of bridging a communication barrier.

**28.** Appellee does not argue that Inspector Buskey lacked probable cause to believe that appellee was violating the immigration laws at the point Buskey learned that appellee was not carrying the required identification papers. Appellee also has not raised the issue of Agent Markonni's authority to arrest appellee at Inspector Buskey's direction. There is also no issue raised in this appeal regarding the legality of the search at the INS office.

tion to suppress the cocaine discovered in appellee's tote bag must be REVERSED. Although we conclude that appellee was seized from the point that Agent Markonni gestured for him to follow, we find this seizure was not unreasonable because it was supported by reasonable, articulable suspicion. In addition, we find that the seizure did not ripen into an arrest until Inspector Buskey learned that appellee was in violation of the immigration laws and directed Agent Markonni to detain appellee for transport to the INS office for further interrogation.[29]

---

**29.** Because we conclude that the walk into the Delta office did not constitute an arrest, we do not reach the issue of whether Agent Markonni had probable cause to arrest appellee for a narcotics offense.