[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-11519

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEP 01, 2011
JOHN LEY
CLERK

D.C. Docket No. 1:08-cv-21571-PAS

AMANDA JESSUP,

Plaintiff - Appellant,

versus

MIAMI-DADE COUNTY,
a political Subdivision,
CORPORAL KATRINA ROBINSON,
M. VALDES,
City of South Miami Police Officer,
LIEUTENANT WAGNER,
City of South Miami Police Officers,
CITY OF SOUTH MIAMI,
a Municipality,

Defendants - Appellees,

CAPTAIN BETTY FULLER,
individually, et al.,

Defendants.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(September 1, 2011)

Before BARKETT, WILSON and ARNOLD,[*] Circuit Judges.

PER CURIAM:

Amanda Jessup appeals from an adverse summary judgment on her state law false arrest claim against the City of South Miami alleging that she was arrested without probable cause. She also appeals from an adverse summary judgment on her 42 U.S.C. § 1983 claims against City of South Miami Police Officers Maximilian Valdes and Darby Wagner alleging that her arrest also violated her Fourth and Fourteenth Amendment rights. Finally, she appeals from an adverse summary judgment on her § 1983 claims against Miami-Dade County and its law enforcement officer, Katrina Robinson, alleging that they violated her Fourteenth Amendment due process rights by being deliberately indifferent to her serious medical and psychiatric needs. We affirm summary judgment in favor of Miami-

_____

[*] Honorable Morris S. Arnold, United States Circuit Judge for the Eighth Circuit, sitting by designation.

2

Dade County and Robinson.[1]  However, we find that genuine disputes of material facts preclude summary judgment on Jessup's remaining claims against the City of South Miami, Officer Valdes, and Officer Wagner.

The evidence in this case is hardly a model of clarity.  Almost everything is disputed.  However, as we are reviewing the district court's grant of summary judgment, we must view the evidence and draw inferences in the light most favorable to the non-moving party, Jessup, in order to determine whether there exists a "genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists, and summary judgment is inappropriate, when "there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor."  Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995).

Viewed in the light most favorable to Jessup, the evidence shows the following.  Officer Valdes was dispatched to a private residence at 2:45 a.m. to

---

[1] Jessup argues that the district court erred in refusing to consider at summary judgment certain evidence, which, if considered, would have created a disputed issue of material fact regarding her deliberate indifference claim.  The evidence was the declaration of a third-party who transcribed a witness's oral statements made in a sworn video statement and who attested that the transcription was true and accurate.  However, the declaration is not the witness's sworn statement to a court reporter, but is a transcription by a person of unknown qualifications of the witness's prior sworn statement that was made under unknown conditions and in the presence of unknown persons.  Jessup simply has not shown how the transcriber's declaration is as reliable as the witness's signed affidavit or as the witness's deposition.  Accordingly, the district court did not abuse its discretion in refusing to consider this evidence.

investigate a complaint that a basketball had been stolen. That evening, Jessup had been visiting her boyfriend, Karl Casebeer, at his house, which was located down the street from where the basketball had been reported stolen. When Officer Valdes passed Casebeer's house, Jessup and Casebeer had gone outside and were talking in the gated side yard of Casebeer's house. When Officer Valdes saw them, he stopped his patrol car, drew his gun, yelled "Let me see your hands, step out," and ordered them both to the ground when they stepped outside the gate onto the sidewalk. Together with Officer Wagner, who had arrived as back-up, Officer Valdes patted down Jessup and Casebeer.

After finding no weapons, Jessup and Casebeer were permitted to stand, and Officer Valdes told Jessup to step away while he questioned Casebeer about the missing basketball. At that point, Officer Valdes saw a basketball in Casebeer's front yard, and asked Casebeer if he had stolen it; Casebeer answered that his father had given the basketball to him for Christmas and that he had not stolen it. Officer Valdes then placed handcuffs on Casebeer and "got right in [his] face, called [him] a liar and a thief," and "cussed at" him. Officer Valdes was "yelling at [Casebeer]" from such close range that Casebeer "could feel [Officer Valdes's] spit on [his] face." During this exchange, Jessup remained standing next to

4

Casebeer and Officer Valdes and interjected that the basketball belonged to Casebeer and that "this is ridiculous."

Officer Wagner "looked kind of shocked" at Officer Valdes's actions, and decided to check with the neighbor who had called in the theft to determine whether the basketball on Casebeer's lawn belonged to her. By this time, Casebeer's stepbrother, Joseph Crockett, had woken up Casebeer's father, and both had come outside. Casebeer's father told the officers that the basketball in the yard belonged to Casebeer and that he had given it to him for Christmas. The officers then asked the neighbor, who had been brought to Casebeer's house, to get her son and find out if he knew where his basketball was. The neighbor left and shortly thereafter returned with her son, who had his basketball with him, thus confirming Casebeer's story that he had not stolen his neighbor's ball, and that the ball on his lawn was his.

However, even after the neighbor's son returned with his own basketball, Officer Valdes continued to accuse Casebeer of lying and of having gone into the neighbor's yard. At this point, Jessup, who had been standing off to the side and occasionally interjecting that she thought "this [was] nonsense" or "bullshit" because she and Casebeer "hadn't done anything," raised her voice and began "getting louder." Jessup was, in Crockett's words,

[j]ust kind of protesting over and over, because she felt like it was – I don't know. It seemed like she felt it was ridiculous that it had gotten to this point and hadn't been resolved simply when they asked him, and then found out that the lady was wrong about, you know, what basketball they had and whatnot.

The officer told Jessup to be quiet, and that if she said another word, he was going to arrest her. Jessup then said one word, "ridiculous," with a sigh, and Officer Valdes arrested her for obstructing justice in violation of § 843.02, Florida Statutes, handcuffed her, and put her in the back of the police car.[2] Jessup was then transported to jail, where she became psychotic and suicidal.

---

[2] The record establishing this time-line is anything but clear, but we emphasize again that at this stage we are required to view the record in the light most favorable to Jessup, making all reasonable inferences and credibility determinations in her favor. See Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir. 2000).

Here, the deposition testimony is deeply conflicted on the dispositive question: whether Casebeer's neighbor and her son returned from their house with their ball or otherwise informed the officers of their mistake before Officer Valdes arrested Jessup. The neighbor's recollection of the nature of the inquiry differed from that of both the officers and the residents of the Casebeer house, but she claimed to have "left the scene" as the situation "was getting heated" but before any arrest was made. Officer Valdes, by contrast, testified that Jessup had been so hostile to questioning that they were unable to learn anything at all about the facts because she kept interrupting. Officer Valdes specifically testified that he had not even ascertained that Casebeer lived in the house at the time of Jessup's arrest. Officer Wagner, meanwhile, testified that Casebeer had said, not that the basketball was his, but that he had found it. Further, contrary to the testimony of Casebeer and his stepbrother, Officer Wagner testified that he took the basketball back to the neighbor and her son, who then confirmed that the basketball found on the Casebeers' lawn was theirs. In fact, Officer Wagner testified, the only reason that he did not arrest Casebeer for theft was that the neighbor "refused to press charges." In sum, the testimony on when the officers learned that the basketball had not been stolen—or even whether it was—is thoroughly in dispute. But reading these conflicting stories in the light most favorable to Jessup, we must accept that the neighbor and her son had at least informed the officers that they had found their ball. The officers were thus aware that neither Casebeer nor Jessup nor anyone else had stolen it.

Jessup makes two separate claims with reference to her assertion that Officers Valdes and Wagner lacked probable cause to arrest her for obstruction of justice: a federal 42 U.S.C. § 1983 claim and a state law false arrest claim. In her 42 U.S.C. § 1983 claims against Officers Valdes and Wagner, she alleges that the arrest violated her federal constitutional rights to be free from unreasonable searches and seizures.[3] In response to these § 1983 claims, Officers Valdes and Wagner raise the defense of qualified immunity, to which they are entitled if they had "arguable probable cause" to arrest Jessup. Lee v. Ferraro, 284 F.3d 1188, 1195 (11th Cir. 2002).

Jessup's second claim is a state law false arrest claim against the City of South Miami, based on the actions of Officers Valdes and Wagner.[4] Under Florida law, a city is liable for a false arrest claim based upon the actions of its officers. Maybin v. Thompson, 514 So. 2d 1129, 1131 (Fla. Dist. Ct. App. 1987) (citing Richardson v. City of Pompano Beach, 511 So. 2d 1121 (Fla. Dist. Ct. App. 1987)). A city may not rely on the defense of sovereign or qualified immunity

---

[3] A warrantless arrest violates the Fourth Amendment if it is made without probable cause. Henry v. United States, 361 U.S. 98, 101-03 (1959).

[4] In Florida, the tort of false arrest "is defined as 'the unlawful restraint of a person against his will, the gist of which action is the unlawful detention of the plaintiff and the deprivation of his liberty.'" Escambia Cnty. Sch. Bd. v. Bragg, 680 So. 2d 571, 572 (Fla. Dist. Ct. App. 1996) (per curiam) (quoting Johnson v. Weiner, 19 So. 2d 699, 700 (Fla. 1944)).

under Florida law.  See Lester v. City of Tavares, 603 So. 2d 18, 19 (Fla. Dist. Ct. App. 1992) (per curiam); Maybin, 514 So. 2d at 1131.  Thus, the question with respect to Jessup's state law claim against the city is whether the officers had probable cause to arrest her for obstruction of justice.

To constitute obstruction of justice, under § 843.02, Florida Statutes, the officer must have been engaged in "[1] the lawful execution [2] of a legal duty; and [3] the defendant's action, by his words, conduct, or a combination thereof, [must have] constituted obstruction or resistance of that lawful duty."  CEL v. State, 24 So. 3d 1181, 1185-86 (Fla. 2009) (per curiam).  There is no question that Officers Valdes and Wagner had a legal duty to investigate the theft of a basketball.  The question here, however, is whether the manner in which they were executing that duty was lawful.  If the Terry[5] stop of Jessup and Casebeer was unlawful or became unlawful at any point before Jessup's resistance occurred, then the first element of § 843.02 was not satisfied, and the officers were not engaged in the lawful execution of their duty to investigate.

---

[5] Under Terry v. Ohio, a police officer may stop, detain, and briefly question a citizen if the officer "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot."  392 U.S. 1, 30 (1968).  Reasonable suspicion must be more than an "inchoate and unparticularized suspicion or 'hunch.'"  Id. at 27.  "[T]he detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity."  United States v. Cortez, 449 U.S. 411, 417-418 (1981).  No one disputes that the officers' detention of Jessup and Casebeer constituted a Terry stop.

Under Florida law, "[i]n determining whether an officer was engaged in the lawful execution of a legal duty, we must apply the legal standards governing the officer's duty at the point that the resistance occurs. In cases involving an investigatory detention, it is necessary for the State to prove that the officer had a reasonable suspicion of criminal activity that would support the detention." Davis v. State, 973 So. 2d 1277, 1279 (Fla. Dist. Ct. App. 2008) (citation omitted). Applying this principle, in C.H.C. v. State, 988 So. 2d 1145 (Fla. Dist. Ct. App. 2008), the court held that the defendant's actions in fleeing from an officer after the officer had directed him to stop did not constitute obstruction of justice under § 843.02 because the officer did not have the requisite reasonable suspicion to conduct a Terry stop, and thus his execution of his legal duties was not lawful. Id. at 1146-47. Likewise, in M.R. v. State, 34 So. 3d 143 (Fla. Dist. Ct. App. 2010), the court held that the defendant did not violate § 843.02 when she resisted an officer because the officer was not lawfully executing his legal duty when he detained the defendant without reasonable suspicion. Id. at 144-45.

After careful review, we conclude that, viewing the disputed facts in the light most favorable to Jessup, there is sufficient evidence based upon which a reasonable jury could decide that the officers were not engaged in a lawful Terry stop at the time Jessup was arrested. Even if we assume that the officers initially

9

had reasonable suspicion to stop Jessup and Casebeer, once they learned that no basketball had actually been stolen, there was no further basis for suspecting any criminal activity and, thus, no lawful reason to continue any detention. Jessup presented sufficient evidence from which a reasonable jury could find that the officers learned of this material fact before they arrested Jessup. If they did, then any Terry stop should have ceased at that point. Florida v. Royer, 460 U.S. 491, 500 (1983) (plurality opinion) (making clear that "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop"); Croom v. Balkwill, 645 F.3d 1240, 1251 n.15 (11th Cir. 2011) (per curiam) (noting that Terry investigative stops must "cease once law enforcement's reasonable, articulable suspicions of [detainee are] allayed"); see also United States v. Watts, 7 F.3d 122, 126 (8th Cir. 1993) ("[A]n investigative stop must cease once reasonable suspicion or probable cause dissipates."). Here, the officers continued to detain and question Jessup and Casebeer. Prolonging the Terry stop after learning that no theft had occurred was unlawful, and the officers had no reasonable basis for believing otherwise. Thus, "the facts and circumstances [were not] sufficient to warrant a prudent man in believing that" the first element of § 843.02 was satisfied—i.e., that they were lawfully executing a legal duty. See Gerstein v. Pugh, 420 U.S. 103, 111 (1975) (internal quotation mark omitted).

10

Because a reasonable jury could find that the officers lacked probable cause to arrest Jessup for violating § 843.02, Jessup is entitled to have a jury resolve the disputed issues of fact that remain in this case, and the district court erred in granting the City of South Miami summary judgment on Jessup's state law false arrest claim.

For the same reasons, the district court erred in granting summary judgment to Officers Valdes and Wagner on Jessup's 42 U.S.C. § 1983 claims. "It is clearly established that an arrest made without probable cause violates the Fourth Amendment." Redd v. City of Enterprise, 140 F.3d 1378, 1382 (11th Cir. 1998). Given that, under the facts viewed in the light most favorable to Jessup, the officers had absolutely no basis for prolonging the Terry stop once they learned that no basketball had been stolen, it is not "arguable" that they possessed probable cause to believe that the first element of § 843.02 had been satisfied, and thus they lacked "arguable probable cause" to arrest Jessup and were not entitled to qualified immunity.

For the foregoing reasons, we reverse summary judgment as to Jessup's state law false arrest claim against the City of South Miami; reverse summary judgment as to Jessup's 42 U.S.C § 1983 claims against Officers Valdes and

Wagner; and affirm summary judgment as to Jessup's 42 U.S.C. § 1983 claims against Miami-Dade County and Officer Robinson.

**AFFIRMED, IN PART; REVERSED AND REMANDED, IN PART.**

BARKETT, Circuit Judge, specially concurring:

I join the majority opinion in full, but write separately because I also believe that Officer Valdes's initial detention of Jessup and Casebeer was unlawful. Officer Valdes only relied on two facts to order Jessup and Casebeer to the ground at gunpoint: (1) the time—it was 2:45 a.m.; and (2) the location—Jessup and Casebeer were outside, in a yard that was just down the street from the house where the basketball was reported missing.[1]  The Supreme Court, this Court, and the Florida Supreme Court have all held that such sparse facts do not give rise to the requisite reasonable suspicion needed to justify a Terry stop.

The Supreme Court has unequivocally stated that "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." Illinois v. Wardlow, 528 U.S. 119, 124 (2000).  Similarly, we have held that a defendant's presence in an area known for crime, even at night, is not sufficient in itself to establish reasonable suspicion.  United States v. Gordon, 231 F.3d 750, 756 (11th Cir. 2000) (concluding that, had the defendants merely been

---

[1] No evidence indicates that Valdes saw the basketball before ordering Jessup and Casebeer out of the yard and to the ground.

13

"sighted standing, at night, within ten feet of a parked car, surrounded by largely abandoned buildings, a Terry stop would not have been justified).[2]

Likewise, in Levin v. State, the Florida Supreme Court held that the following facts were "patently insufficient" to create reasonable suspicion to support a Terry stop: the defendant "was walking along the public street at 3:00 or 3:30 a.m. in a 'high class' residential area with a companion . . . and [] there had been prior residential burglaries committed in the area." 449 So. 2d 288, 288 (Fla. Dist. Ct. App. 1983), adopted by State v. Levin, 452 So. 2d 562 (Fla. 1984). Further, in Popple v. State, the Florida Supreme Court held that no reasonable suspicion existed for an officer, who was investigating an abandoned stolen car, to stop the occupants of a car that was sitting nearby in a desolate area. 626 So. 2d 185, 186 (Fla. 1993). And in Mullins v. State, the Florida Supreme Court held that

_____

[2] Something more than a defendant's suspicious presence in an area has always been required by the Supreme Court and our Circuit for a lawful Terry stop. See Wardlow, 528 U.S. at 124. For example, the Supreme Court has "recognized that nervous, evasive behavior is another pertinent factor in determining reasonable suspicion," with unprovoked headlong flight being the "consummate act of evasion." Id. Likewise, we have found that a defendant's evasive behavior, including his flight from law enforcement, is an additional factor that gives rise to reasonable suspicion. See United States v. Jordan, 635 F.3d 1181, 1187 (11th Cir. 2011) (explaining that defendant's presence in an area known for crime, his belligerent attitude, bulge in his pocket and his flight from the law enforcement officers together supported the conclusion that the officers had reasonable suspicion to conduct a Terry stop); United States v. Franklin, 323 F.3d 1298, 1301-03 (11th Cir. 2003) (defendant's flight was particularly suspicious because of its nature and duration); United States v. Hunter, 291 F.3d 1302, 1306-07 (11th Cir. 2002) (finding reasonable suspicion for a Terry stop where individual was in a high-crime area, observing an illegal gambling dice game, had a noticeable bulge in his pocket, and walked quickly away when officers approached the area).

14

riding a bicycle slowly through a residential area in the very early morning hours was "clearly insufficient to give rise to anything more than a bare suspicion of illegal activity." 366 So. 2d 1162, 1163 (Fla. 1979).[3]

Here, there is no evidence that either Jessup or Casebeer exhibited any behavior or actions that could even arguably be classified as suspicious. They were simply standing in the side yard of a private residence. And when Officer Valdes ordered them to step forward, they immediately and without incident complied. Relying on Jessup and Casebeer's presence near the complainant's house and the time of night to justify a Terry stop is no different than relying on an individual's presence in a high crime area at night to justify a stop. Accordingly, based on the summary judgment evidence viewed in the light most favorable to Jessup, I believe that Officer Valdes's Terry stop of Jessup and Casebeer was unlawful.

---

[3] See also Coladonato v. State, 348 So. 2d 326, 327 (Fla. 1977) (no reasonable suspicion for stopping a van merely because "it was an unusual vehicle to be in the area at that time of night"); M.R. v. State, 34 So. 3d 143, 144-45 (Fla. Dist. Ct. App. 2010) (no reasonable suspicion when defendant's conduct "consisted only of walking down the street in a 'high prostitution area' at 9:30 in the evening"); Kell v. State, 559 So. 2d 731, 731 (Fla. Dist. Ct. App. 1990) ("[T]he mere fact that the appellant was present in a high crime area, which happened to be where he lived, at nighttime, without more, such as suspicious conduct or unusual circumstances . . . does not warrant an investigatory stop."); McCloud v. State, 491 So. 2d 1164, 1167 (Fla. Dist. Ct. App. 1986) (no reasonable suspicion to support a stop based "merely upon the 'time' of day and the 'location' of the appellant's car").

This is not to suggest that Officer Valdes was required to ignore Jessup and Casebeer, or that he was prohibited from investigating whether Jessup and Casebeer had stolen the basketball. It would have been perfectly lawful for him to pursue a consensual citizen encounter, such as approaching Jessup and Casebeer, identifying himself as a police officer, and asking them questions about the stolen basketball in a non-coercive manner. See United States v. Espinosa-Guerra, 805 F.2d 1502, 1507 (11th Cir. 1986). But we have surely not reached the point in this country where people cannot relax in their yards at night without the fear of being seized at gunpoint just because someone down the street thinks that his basketball is missing. To invade a person's "inestimable right of personal security" in such a profound way, Terry v. Ohio, 392 U.S. 1, 8-9 (1968), reasonable suspicion is required. "Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result [the Supreme Court] has consistently refused to sanction." Id. at 22.