[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-12805
Non-Argument Calendar
_____

D.C. Docket No. 4:16-cr-10017-JEM-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

LAWRENCE W. BLESSINGER,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(October 2, 2018)

Before MARTIN, NEWSOM, and BRANCH, Circuit Judges.

PER CURIAM:

Lawrence W. Blessinger appeals his conviction for smuggling foreign citizens into the United States.  He argues the evidence against him was obtained in violation of the Fourth Amendment.  After careful review, we affirm.

## I. BACKGROUND

### A.    FACTUAL BACKGROUND

On December 5, 2014, Sergeant Joel Slough of the Monroe County Sheriff's Office was driving on Coco Plum Drive in Marathon, Florida, in the Florida Keys.  Coco Plum Drive is a spur off of US-1, the only road connecting the Florida Keys to the mainland.  A number of short, dead-end roads connect to Coco Plum Drive, including Pescayo Avenue.  Other than three vacation rental homes near the end of the street, no other properties are located on Pescayo Avenue.

As he was driving by Pescayo Avenue, Sergeant Slough saw a black truck parked at the far end of street, past the rental houses.  He patrolled the area every day, but rarely saw any vehicles parked on Pescayo Avenue.  Sergeant Slough suspected the truck might be illegally dumping trash or other debris.  He turned his vehicle around and pulled onto Pescayo Avenue.

At that point the black truck was traveling up Pescayo Avenue toward Coco Plum Drive.  As he passed the truck, Sergeant Slough saw the driver of the truck—Blessinger—waive to him.  Once Sergeant Slough passed the truck, he drove until he was 100 to 150 feet from the end of Pescayo Avenue.  From there he saw a six-

2

foot tall pile "of green vegetation where the truck [had been] parked and it was surrounded by brown or dehydrated vegetation." Sergeant Slough suspected the vegetation was recently cut yard clippings. The pile was on land Sergeant Slough believed was private property.

Sergeant Slough turned his car around and followed the black truck. He activated his lights and caught up to the truck at the intersection of Coco Plum Drive and US-1. He easily identified the truck based on a distinctive orange stripe and the presence of a Harley-Davidson logo on the rear tailgate. The truck pulled over. As Sergeant Slough approached the truck on foot, he saw small pieces of fresh green vegetation on the tailgate and in the truck bed.

Blessinger was driving the truck and had one passenger, Maria Ortega. Sergeant Slough asked both for identification, believing they were both involved in the illegal dumping. Ortega did not have any identification. She spoke only Spanish, so Sergeant Slough called for a translator from Border Patrol, believing them to be the closest available assistance. When the translator arrived, Ortega confessed to helping Blessinger dump the yard waste. She also indicated that she might be in the United States illegally, but the Border Patrol agent stopped her before she could make any further incriminating statements. Sergeant Slough arrested Blessinger for illegal dumping.

3

A few months after the stop, Sergeant Slough learned that Blessinger had earlier been stopped by Border Patrol while at sea on suspicion of illegally travelling to Cuba. Based on this information, and the fact that Ortega was in Blessinger's truck when it was pulled over, Sergeant Slough suspected Blessinger might be involved in human trafficking, and he contacted the Department of Homeland Security ("DHS").

DHS Agent Todd Blyth interviewed Ortega. She told him that Blessinger had illegally transported her and two others into the United States.

B.    PROCEDURAL HISTORY

Blessinger was charged with seven immigration-related offenses, including illegally bringing aliens into the United States, inducing aliens to unlawfully enter the United States, and conspiring to do the same, all in violation of 8 U.S.C. § 1324(a). He moved to suppress the evidence, arguing Sergeant Slough lacked justification to pull him over, and that all evidence against him was tainted by that unlawful stop.

The district court held a suppression hearing. Sergeant Slough testified that the Sheriff's Office had received reports in November 2014 of illegal dumping nearby, and that illegal dumping was an enforcement priority for the office. He explained his initial belief that the truck may have been illegally dumping on Pescayo Avenue was based on "[t]he specific location being as isolated as it is,"

4

the fact that the truck was backed into the end of the street, the fact that it was a large vehicle, and his knowledge of recent reports of illegal dumping nearby. He also testified that he thought Blessinger's wave to him was a sign of nervousness, and that he believed Blessinger sped away from the scene and drove erratically at the intersection with US-1. Agent Blyth testified at the hearing that he opened the DHS investigation into Blessinger after Sergeant Slough told him about his encounter with Blessinger and Ortega.

 The magistrate judge issued a report and recommendation (R&R) recommending the motion to suppress be denied. The magistrate judge found Sergeant Slough had reasonable suspicion that Blessinger had committed a crime, and therefore the traffic stop was valid.[1] She also found the evidence discovered by DHS was sufficiently removed from the traffic stop to attenuate any taint. Over Blessinger's objections, the district court adopted the R&R and denied the motion to suppress.

Blessinger then pled guilty to two counts of bringing an alien into the United States at a location other than a designated port of entry. As part of his plea, Blessinger admitted he smuggled two Paraguayan citizens into the United States on his boat so they could work as domestic servants in his home. In his plea

---

[1] The magistrate judge also found she was not bound by the state court in Blessinger's parallel illegal dumping case, which had found the stop was unlawful and had suppressed all evidence against Blessinger. See United States v. Perchitti, 955 F.2d 674, 675–677 (11th Cir. 1992).

agreement he retained the right to appeal the denial of the motion to suppress. The district court sentenced Blessinger to twelve months and one day in prison.

This appeal followed.

## II. LEGAL STANDARD

"In reviewing a district court's ruling on a motion to suppress evidence, we review factual findings for clear error and the court's application of law to those facts de novo." United States v. Goddard, 312 F.3d 1360, 1362 (11th Cir. 2002). Facts are construed "in the light most favorable to the prevailing party." Id. An evidentiary error based on an incorrect application of the constitution warrants reversal unless "it was harmless beyond a reasonable doubt." Harrington v. California, 395 U.S. 250, 251, 89 S. Ct. 1726, 1727 (1969) (quotation marks omitted).

## III.  ANALYSIS

Blessinger challenges the denial of his motion to suppress, arguing Sergeant Slough illegally stopped his truck, such that all the evidence discovered against him—including in the subsequent DHS investigation—was tainted by the illegal stop. We turn first to his argument regarding the validity of the traffic stop.

A.    FACTUAL FINDINGS

Blessinger begins by asserting the district court clearly erred in making three specific factual findings: 1) there had been reports of illegal dumping nearby; 2)

6

Sergeant Slough knew debris had been dumped before in that area; and 3) Blessinger drove quickly away as soon as Sergeant Slough approached. "A fact finding is clearly erroneous when, after reviewing all the evidence, the court is left with the definite and firm conviction that a mistake has been committed." United States v. Philidor, 717 F.3d 883, 885 (11th Cir. 2013) (per curiam) (quotation marks omitted).

Sergeant Slough testified that the Sheriff's Office received a report of dumping on Avenue L or Avenue K, which abut Coco Plum Drive, in November 2014. Since that report, the Sheriff's Office had been conducting extra patrols specifically to look for dumping. Blessinger argues that the report referenced dumping that occurred weeks earlier, approximately a mile away. But this does not render clearly erroneous the district court's finding that "there had been a report of illegal dumping in the neighborhood which included Coco Plum Drive and Pescayo Avenue." The "neighborhood" surrounding Coco Plum Drive and Pescayo Avenue is confined on a small island. Avenue K and Avenue L, which are about a mile from Pescayo Avenue are not so far away as to render the district court's observation clearly erroneous. Neither did the district court clearly err in referring to the report as "recent": the report was received in "late November," and Sergeant Slough's interaction with Blessinger occurred on December 5.

Sergeant Slough also testified to his personal experience with illegal dumping, explaining that he had previously found garbage, including yard waste, littered in the area around Coco Plum Drive.  Blessinger argues there was only one prior report of dumping at the end of Pescayo Avenue, and Sergeant Slough did not know of it.  By this argument, Blessinger seeks to narrow the extent to which the Sheriff's Office could respond to the information it had about dumping: Sergeant Slough knew dumping had occurred off of Coco Plum Drive, but not at Pescayo Avenue in particular.  Because we review the district court's findings of fact for clear error, we reject Blessinger's argument that the district court clearly erred in finding Sergeant Slough knew of dumping "in the same location."  The district court was reasonable in using "in the same location" broadly to mean in the vicinity of Coco Plum Drive.

Finally, Sergeant Slough testified the truck left Pescayo Avenue when he arrived and it sped down Coco Plum Drive away from him.  Blessinger argues it took Sergeant Slough "approximately 27 seconds to turn his police car around and return to Pescayo Avenue," meaning there is no support for a finding that he took off as soon as he saw Sergeant Slough.  But the district court did not find that Blessinger drove away instantaneously.  Instead it found Blessinger drove away "as soon as Sergeant Slough turned his police car around to investigate." Blessinger's truck was stationary when Sergeant Slough first passed Pescayo

8

Avenue, but when Sergeant Slough returned seconds later, Blessinger was driving out toward Coco Plum Drive. That Blessinger took action during the 27 seconds it took for Sergeant Slough to turn his car around is consistent with a finding that it happened "as soon as Sergeant Slough turned his police car around to investigate." Blessinger also argues that, based on dash cam footage, his truck was travelling at no more than 29 miles per hour. But the district court acknowledged that "Sergeant [Slough] conceded that the Defendant may have been travelling at the posted speed limit." Finding that Blessinger drove "quickly" does not mean he must have been speeding, and there was sufficient evidence—based on the speed with which Sergeant Slough had to travel to catch up to the truck—to support a finding that Blessinger did not drive slowly, but instead moved quickly.

Thus, while Blessinger has pointed to some inconsistencies in the evidence, we are not left with the "definite and firm conviction that a mistake has been committed." Philidor, 717 F.3d at 885. These findings were not clearly erroneous.

B.    REASONABLE SUSPICION FOR THE STOP

Under Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868 (1968), "the police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" United States v. Sokolow, 490 U.S. 1, 7, 109 S. Ct. 1581, 1585 (1989) (quoting Terry, 392 U.S. at 30–31, 88 S. Ct. at 1884–85). This standard is less onerous than

9

demonstrating probable cause for an arrest.  United States v. Dunn, 345 F.3d 1285, 1289 (11th Cir. 2003).  To justify an investigatory stop, the officer must "show a reasonable, articulable suspicion that the person has committed or is about to commit a crime."  United States v. Espinosa-Guerra, 805 F.2d 1502, 1506 (11th Cir. 1986).  An officer's reasonable beliefs are judged by the "totality of the circumstances," taking into account the officer's "experience and specialized training."  United States v. Arvizu, 534 U.S. 266, 273–74, 122 S. Ct. 744, 750–51 (2002) (quotation marks omitted).

Blessinger challenges whether Sergeant Slough had reasonable suspicion to believe he had illegally dumped yard clippings on Pescayo Avenue.  Under Florida's "Litter Law," it is unlawful to "dump litter in any manner or amount . . . [i]n or on private property, unless prior consent of the owner has been given."  Fla. Stat. § 403.413(1), (4)(c).  Litter is defined as "any garbage; rubbish; trash; refuse; . . . or substance in any form resulting from domestic, industrial, commercial, mining, agricultural, or governmental operations."  Id. § 403.413(2)(f).

Blessinger argues Sergeant Slough did not know whether he had permission to dump yard waste on the private property.  But reasonable suspicion does not require proof that every element of the offense has been met.  Cf. Jordan v. Mosley, 487 F.3d 1350, 1355 (11th Cir. 2007) ("No officer has a duty to prove every element of a crime before making an arrest.").  Sergeant Slough observed

10

that the six-foot high pile of vegetation was green, while the surrounding vegetation was brown and dehydrated, indicating the pile had been brought from another site and recently placed there. The fact that this pile had been placed in a particularly remote location—at the far end of a dead-end street that rarely had any vehicle traffic—increased the likelihood that it had been surreptitiously secreted, rather than lawfully placed. And Blessinger left the scene at the same time Sergeant Slough arrived. From these facts Sergeant Slough could reasonably suspect the vegetation had been placed there without permission. See District of Columbia v. Wesby, 583 U.S. ___, 138 S. Ct. 577, 587 (2018) (holding police could reasonably infer partygoers lacked permission to be at a home based on the totality of the circumstances and "common-sense conclusions about human behavior" (quotation marks omitted)).

Blessinger also challenges Sergeant Slough's belief that he drove nervously or erratically. However, even accepting Blessinger's arguments on these factors, there was still a valid basis for Sergeant Slough to stop Blessinger's truck. Taking account of all the known circumstances, Sergeant Slough saw a large pile of fresh yard clippings at the dead end of a remote street—strong evidence of illegal dumping. He knew illegal dumping had occurred recently nearby, and he knew from experience it was unusual to see vehicles parked at the end of Pescayo Avenue. He had personally seen Blessinger's truck parked near the dumping area

11

and watched him leave just moments before.  Finally, Blessinger's truck was capable of holding the amount of illegally dumped waste Sergeant Slough observed.  These facts—even excluding any disputed allegations of speeding, erratic driving, or other nervous driving behavior—were sufficient for Sergeant Slough to reasonably suspect that a crime had been committed and that Blessinger was the person who committed it.

This means Sergeant Slough had sufficient justification to detain Blessinger in accordance with Terry.  See Espinosa-Guerra, 805 F.2d at 1506.  Blessinger does not question the manner in which Sergeant Slough conducted the stop, nor does he point to any other potential violations of his Fourth Amendment rights.  Thus, the stop was valid, and the evidence that flowed from that stop was admissible against Blessinger.[2]  The district court did not err in denying his motion to suppress.

**AFFIRMED.**

---

[2] Because we conclude there was no Fourth Amendment violation, we need not address Blessinger's arguments on whether later-discovered evidence was sufficiently attenuated from the traffic stop.